STATE OF NORTH CAROLINA v. JUNIOR BRAGG KING

No. 521A82

(Filed 28 August 1984)

1. Homicide § 12— general indictment for murder—no decision as to degree of murder before indictment returned—trial for first degree murder not barred

The State was not barred from prosecuting defendant for first degree murder because he was indicted under a general indictment for murder which did not specify whether it charged first or second degree murder and the district attorney had not made a decision to prosecute for first degree murder at the time the bill of indictment was submitted to the grand jury.

2. Criminal Law § 22— arraignment for "murder"—prosecution for first degree murder not barred

The prosecution of defendant for first degree murder was not barred on the ground that he was arraigned generally for "murder" and not specifically for first degree murder where defendant waived a reading of the indictment at his arraignment and made no objection at the arraignment to the proceedings.

3. Constitutional Law § 28; Homicide § 31.3— first degree murder—no arbitrary selection of defendant for prosecution

The prosecution of defendant for first degree murder was not barred on the ground that he was arbitrarily and capriciously selected for trial under our capital sentencing statute where there was no showing that the district attorney based his decision to prosecute defendant for first degree murder upon an unjustifiable standard like race, religion or other arbitrary classification.

4. Criminal Law § 75.12— confession violating Miranda rights—use for impeachment

A defendant's statement elicited in violation of his Miranda rights may nevertheless be used on cross-examination to impeach defendant's testimony provided the statement was voluntarily made.

5. Criminal Law § 75.12— confession violating Miranda rights—use for impeachment—voluntariness

The evidence and the trial court's findings of fact supported the conclusion of law that defendant's in-custody statements, even if obtained in violation of defendant's Miranda rights, were voluntary and could properly be used to impeach defendant's testimony.

6. Jury § 5— hearing impaired juror—refusal to excuse

Although it is the better practice for trial judges freely to excuse any juror who has a genuine hearing impairment which in the juror's opinion would hamper his or her ability to perform a juror's duties, the trial judge's failure to do so in this case did not constitute an abuse of discretion where the trial judge questioned the juror and concluded that his hearing was not so impaired as to prevent him from serving as a juror, and the juror stated that he

could raise his hand during the trial if anything was said which he did not understand.

**7. Criminal Law §§ 34.7, 34.8— proof of another crime—admissibility to show motive and common scheme**

In a prosecution for first degree murder, testimony by a witness tending to show that defendant shot the victim's current boyfriend before he went to .the victim's house and shot her was relevant to show that defendant's motive for shooting the victim was jealousy and to show that both shootings arose out of a common scheme of defendant.

**8. Homicide § 15.4— testimony about autopsy—sufficient foundation**

An officer's testimony that he knew the murder victim personally and attended the autopsy and received a large caliber bullet which the pathologist removed from the victim's abdomen laid a sufficient foundation for the pathologist's testimony concerning the autopsy.

**9. Criminal Law § 42.6— tests on weapons and other items—chain of custody**

Testimony concerning tests performed on a pistol and rifle seized from defendant's car, a spent projectile removed from decedent's body, and spent shell casings were properly admitted where the State established a sufficient chain of custody of all the items and showed that there was no material change in their condition from the seizure to the analysis and to the identification during trial.

**10. Criminal Law § 99.2— inquiry by court—no expression of opinion**

The trial court did not express an opinion on the evidence by an inquiry to the jury, immediately before defendant testified, concerning whether it would prefer to reconvene on Saturday or the following Monday. G.S. 15A-1222.

**11. Bills of Discovery § 6— failure to disclose defendant's statements to officers— exclusion of statements not required**

Although defendant's oral statements to officers fall within our discovery statute, G.S. 15A-903(a)(2), and should have been disclosed by the State pursuant to defendant's request, the trial court did not err in failing to exclude such statements as a sanction for failure to disclose them to defendant where defendant was well aware of his pretrial statements to one officer and admitted in his own direct testimony that he had made them; defendant had full opportunity to inquire about his statements to the second officer on voir dire in the absence of the jury; and there was no suggestion that defendant would not have testified had he been previously apprised of the State's contentions about his statements to the second officer.

**12. Bills of Discovery § 6— failure to disclose criminal record—mistrial not required**

The trial court did not abuse its discretion in the denial of defendant's motion for a mistrial made because the State had failed to disclose his criminal record and defendant was cross-examined regarding a 1966 conviction for "an affray with a deadly weapon" where defendant did not object to the cross-

examination, and defendant had admitted on direct examination two prior convictions for assault with a deadly weapon in 1968.

APPEAL by defendant from a verdict of guilty of first degree murder and a judgment sentencing him to life imprisonment entered by *Judge Fetzer Mills* at the 7 June 1982 Criminal Session of the Superior Court of RANDOLPH County.

*Rufus L. Edmisten, Attorney General, by Ralf F. Haskell, Assistant Attorney General, for the state.*

*Thomas F. Kastner for defendant appellant.*

EXUM, Justice.

Defendant raises a number of errors in the pretrial and trial proceedings which led to his conviction of first degree murder. He challenges the sufficiency of the indictment, the manner in which he was arraigned, the exercise of prosecutorial discretion, the admission into evidence of his out-of-court statement, denial of his motion to excuse a juror for cause, various evidentiary rulings, a comment of the trial judge to the jury, denial of a mistrial motion for prosecutorial misconduct, and the trial judge's charge to the jury on motive. We find no reversible error.

I.

Defendant and deceased, Callie Bittle, lived together for a number of years although they were not married. They ceased living together in July 1981 when defendant moved into a house across the street from the house in which they had lived together.

On 22 September 1981 Letha Bittle, mother of the deceased, was at Callie's home with Callie and defendant. John Brown, Callie's new boyfriend, arrived. He approached defendant and asked him why defendant had wanted him to come to the house. Defendant told Brown to leave his wife alone. Callie responded to defendant, "Junior, I'm not your wife. Me and you are not married." Defendant repeated that they were married. Defendant then threatened Callie, saying, "If I catch you with John Brown, I'm going to kill you and him both, and if I catch you with any man, I'm going to kill both you and him."

A neighbor of Brown's, Weldon Garner, testified that on 22 September at approximately 9 or 9:30 p.m. he observed Callie and Brown sitting on the front steps of Brown's trailer. When Garner returned to his trailer at about 10:45 p.m., he observed defendant at Brown's front door. After going into his home, Garner heard a loud noise and remarked to his wife "that's a gunshot." Garner looked and saw defendant coming out of Brown's trailer. Garner went to Brown's trailer, entered it through a window because the front door was locked, and found Brown sitting beside the front door bleeding. Garner did not believe that Brown was breathing.

Later that same night, at approximately 11 p.m., defendant went to Callie's house and knocked on the door. Defendant forced his way into the house. He told Callie that he wanted the title to his truck. Callie began to laugh and giggle. Defendant shot Callie twice with a pistol and, after finding and loading a rifle, shot her again while she was lying on the floor.

Defendant testified in his own behalf. His son from a previous marriage had been killed in an accident in 1974. Using some of the insurance money, defendant paid off the balance due on his truck. He put the title to the truck in Callie's name. When they separated, Callie refused to return the title of the truck to him. Defendant explained that the truck was like a memorial to his dead son; he could not abide the thought of something happening to the truck or of anyone else owning it.

Defendant testified that Callie told him she intended to give the truck to her boyfriend despite her knowing it belonged to him and he valued it greatly. According to defendant, she told him she would take everything he owned and he would have nothing. Callie told him she knew his not having the truck would drive him crazy and after she gave the truck to Brown, her boyfriend, the two of them would ride around in it for everyone to see.

Defendant testified that on the day Callie was killed, he went to Brown's trailer to discuss the truck. Brown laughed at him and told him he had been having sex with Callie and that he would drive defendant's truck any time he wished. Defendant further testified that Brown threatened and struck him. As the defendant fell back, he observed Brown reach into his pocket. At this point defendant shot Brown.

Thereafter defendant drove to Liberty, North Carolina, and went to Callie's residence. He carried the pistol with him. When he asked Callie to transfer the title of the truck to him, she laughed. Defendant stated he had no recollection of what occurred after that, but he "guessed" he shot her. He said the rifle accidentally fired as he was unloading it.

Defendant left Callie's house and went to the police. He told the police that Callie had been shot and that he might be the one for whom they were looking. Defendant denied threatening either Brown or Callie. He said his actions that night were based upon his desire to protect the memory of his dead son and to regain possession of his truck.

Defendant was arrested and charged with the murder of Callie Bittle. A probable cause hearing was held, at which probable cause was found and defendant was bound over to superior court for trial. Relying upon the arrest warrant, the district attorney's office submitted a bill of indictment to the grand jury charging defendant with murder. On 9 November 1982 the grand jury returned the indictment as a true bill.

Defendant moved for a bill of particulars on 11 December 1981. In the motion, defendant requested that the state disclose certain items of information including the degree of the crime being charged.

Three days later the state arraigned defendant for murder. Defendant, represented by counsel, pled not guilty. Thereafter he was tried and convicted of first degree murder and sentenced to life imprisonment. He appeals to this Court as a matter of right. N.C. Gen. Stat. § 7A-30.

## II.

[1] Defendant assigns error to the trial court's denial of his motion to bar his prosecution for first degree murder. First, he claims that prosecution for first degree murder should be barred because he was indicted under a general indictment for murder which did not specify whether it charged first or second degree murder and the district attorney had not made a decision to pros-

ecute for first degree murder at the time the bill of indictment was submitted to the grand jury.[1]

The statute governing murder indictments contains no requirement that the indictment specify the degree of murder sought. N.C. Gen. Stat. § 15-144 provides, in pertinent part, that in an indictment for murder

> after naming the person accused, and the county of his residence, the date of the offense, the averment 'with force and arms,' and the county of the alleged commission of the offense, as is now usual, it is sufficient in describing murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder [naming the person killed], and concluding as is now required by law. . . .

The indictment involved in this case contained these essential allegations and was returned as a true bill by the grand jury. It alleged "That on or about the 22nd day of September, 1981, in Randolph County Junior Bragg King unlawfully and willfully did feloniously and of malice aforethought kill and murder Callie Belle Bittle." We have held that an indictment which meets the requirements of section 15-144 will support a plea of guilty to or a conviction of either first or second degree murder. *State v. Melton*, 307 N.C. 370, 372, 298 S.E. 2d 673, 676 (1983); *State v. Davis*, 290 N.C. 511, 532, 227 S.E. 2d 97, 110 (1976).

We have not found, in this statute or elsewhere, nor has defendant offered any authority or persuasive reason to require that a prosecutor must determine, before the return of the indictment, whether he will ultimately prosecute a defendant for murder in the first or second degree. We decline to impose such a requirement.

---

1. This fact was established through the testimony of the district attorney who said, "At the time of the grand jury indictment, we have not normally designated whether it will be tried at that point for first or second degree." His assistant district attorney who prepared the indictment testified that he did so "in the form provided by the statute and had absolutely not decided at that time what degree of offense the defendant would be tried on."

State v. King

[2]  Defendant next argues that his prosecution for first degree murder should be barred on the ground that he was arraigned generally for "murder" and not specifically for first degree murder.[2]

An arraignment consists of bringing a defendant in open court before a judge having jurisdiction to try the offense, advising him of the charges pending against him, and directing him to plead. The prosecutor must read the charges or fairly summarize them to the defendant. If the defendant fails to plead, the court must record that fact, and the defendant must be tried as if he had pleaded not guilty.

N.C. Gen. Stat. § 15A-941.

An arraignment allows a defendant to enter a plea after hearing the charges against him. *State v. Brown*, 306 N.C. 151, 174, 293 S.E. 2d 569, 584, *cert. denied*, 459 U.S. 1080 (1982). If a defendant feels that he has not been properly informed of the charges against him at arraignment, it is "his duty to object at that time and to have appropriate entries made in the record to show the basis for the objection." *State v. Small*, 301 N.C. 407, 431, 272 S.E. 2d 128, 143 (1980). An objection to the arraignment made just before trial begins some months later "does not suffice to preserve defendant's complaint about what might have occurred when the arraignment actually took place." *Id.*

Defendant was represented by counsel at his arraignment and waived a reading of the indictment. He entered a plea of not guilty. Defendant made no objection at the arraignment to the proceedings. As we have noted above, an indictment drawn in

---

2. The actual arraignment proceedings did not appear in the original record on appeal. There appeared only an entry prepared by defendant's attorney that at arraignment "[t]o the . . . charge of murder the defendant . . . entered a plea of Not Guilty." After inquiry regarding this omission at oral argument, defendant took the following steps: First he moved in superior court to amend the arraignment form originally signed by an assistant clerk which showed that defendant had "entered a plea of not guilty to the charges [sic] of: 1st deg. Murder." The clerk, apparently with the acquiescence of the district attorney, allowed this motion and "corrected" the original arraignment form to read: "To the criminal charge of Murder the defendant, when called upon to plead, entered a plea of not guilty." Thereafter defendant moved this Court pursuant to App. P. R. 9(b)(6) to amend the record on appeal to include the arraignment proceeding *as amended* by the clerk. We have determined to allow this motion and order that the record on appeal be amended accordingly.

conformity with section 15-144, as is the indictment in this case, is sufficient in law to charge first degree murder and all lesser included offenses. Defendant is deemed to have understood the legal effect of the indictment when he entered his plea, absent any showing to the contrary. There is no such showing in this case. We find, therefore, no properly preserved error in defendant's arraignment.

[3] Defendant also contends that his prosecution for first degree murder should have been barred on the ground that he was arbitrarily and capriciously selected for prosecution under our capital sentencing statute. In support of his allegations, defendant examined the district attorney and several of his assistants. This testimony tended to show: (1) The prosecutor's office has no specific policies or guidelines to determine which cases would be prosecuted as capital cases. (2) "It would depend on the aggravating circumstances and also . . . the circumstances of each case." (3) Generally in homicide cases indictments are sought for first degree murder. (4) Thereafter in the exercise of the prosecutor's discretion a decision is made whether to try the case as a capital case or on some lesser degree of homicide. (5) In a homicide prosecution against Dallas Hoover "there were very aggravating circumstances . . . but . . . our decision to prosecute on second degree . . . was based on the weakness of the evidence against the defendant basically."

We addressed the constitutionality of our capital sentencing procedure with regard to this argument in *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984). In *Lawson* we acknowledged that prosecutors have "no statutory or any other kind of guidelines to follow in making these decisions. Often [a prosecutor] declines to seek a first degree murder verdict and the death penalty because of a case's technical or evidentiary problems." *Id.* at 643, 314 S.E. 2d at 500. Nevertheless, we affirmed Lawson's death sentence. We said:

In *Oyler v. Boles*, 368 U.S. 448 (1962), the defendant challenged the constitutionality of West Virginia's habitual criminal statute on the ground that there was selective enforcement by the prosecution. In rejecting this challenge, the Court said:

'[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection never were alleged.'

*Id.* at 456 (citations omitted). In *State v. Cherry*, 298 N.C. 86, 103, 257 S.E. 2d 551, 562 (1979), *cert. denied*, 446 U.S. 941 (1980), the defendant claimed our death penalty procedure denied defendants constitutional due process because it placed no limits on the case calendaring prerogatives of the district attorney, who could, according to defendant, 'calendar cases when he chooses, in front of whatever judge he chooses.' In rejecting this argument, we said:

'Our courts have recognized that there may be selectivity in prosecutions and that the exercise of this prosecutorial prerogative does not reach constitutional proportion unless there be a showing that the selection was deliberately based upon "an unjustifiable standard such as race, religion or other arbitrary classification." ' [Citations, including *Oyler*, omitted.]

*Id.* Here, there is no allegation or even intimation that the district attorney had deliberately employed any 'unjustifiable standard' in calendaring this or any other case involving the death penalty. The United States Supreme Court has rejected arguments identical to defendant's in the context of death penalty procedures. *Gregg v. Georgia*, 428 U.S. 153 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976).

Defendant fails to show that the district attorney based his decision to seek the death penalty in defendant's or any other death case upon unjustifiable standards like 'race, religion or other arbitrary classification.' The United States Supreme Court says the federal constitution does not prohibit the use of absolute prosecutorial discretion in determining which cases to prosecute for first degree murder so long as such discretionary decisions are not based on race, re-

ligion, or some other impermissible classification. We are not inclined to interpret our state constitution to require more.

*Id.* at 643-44, 314 S.E. 2d at 500-01.

Defendant's argument herein is based in part on a comparison of his case with another prosecution against Dallas Hoover. In the Hoover case Mr. Roose, the assistant district attorney who also tried defendant, elected to prosecute for second degree rather than first degree murder. Mr. Roose testified that he based his decision to prosecute Hoover for second degree murder on the weakness of the evidence. Indeed, "there was not," Mr. Roose said, "a conviction" in the Hoover case. Mr. Roose further explained that the presumptive sentence for second degree murder was not applicable to the Hoover case, but was applicable to defendant's case. Mr. Roose felt the 15-year presumptive sentence for second degree murder was inappropriate in defendant's case. Accordingly, he prosecuted defendant for first degree murder.

We find  no suggestion supported by the record that the state deliberately employed an "unjustifiable standard" when it chose to prosecute defendant for first degree murder. Defendant has failed to show that "race, religion or other arbitrary classification" led to his prosecution for first degree murder. The reasons which the prosecutors gave in the instant case for seeking a first degree murder conviction were not impermissible. Neither did they make any impermissible distinctions between this case and the Hoover case in determining how to prosecute each of the cases.

We find no error in the trial court's denial of defendant's motion to bar prosecution for first degree murder.

### III.

Defendant assigns error to the denial of his motion to suppress his out-of-court, in-custody statements to law enforcement officers. These were not offered during the state's case in chief. When defendant testified, his testimony conflicted with these statements. The district attorney cross-examined defendant concerning the prior inconsistent statements in an effort to impeach his credibility. Defendant argues this cross-examination was improper. We disagree.

[4]   The United States Supreme Court has decreed that a defendant's statement, elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), may nevertheless be used on cross-examination to impeach that defendant's testimony provided the statement was voluntarily made. *Harris v. New York*, 401 U.S. 222, 225-26 (1971). We have adopted that rule in North Carolina. *See State v. Overman*, 284 N.C. 335, 200 S.E. 2d 604 (1973); *State v. Bryant*, 280 N.C. 551, 187 S.E. 2d 111, *cert. denied*, 409 U.S. 995 (1972). To determine the voluntariness or trustworthiness of a confession obtained in violation of *Miranda*, the trial court should conduct a voir dire hearing and make appropriate findings of fact and conclusions of law. *See State v. Richardson*, 295 N.C. 309, 245 S.E. 2d 754 (1978).

[5]   In the instant case, defendant objected to the attempted impeachment. The trial court excused the jury and conducted a lengthy voir dire hearing. At the conclusion of this hearing, the court made the following findings of fact:

> That on September 23, 1981, the defendant, Junior Bragg King, was in police—in custody of the officer at the Randolph County Jail at approximately 3:20 a.m., he having voluntarily surrendered himself to the police officers . . . sometime shortly after 11 p.m.; that he was either charged with murder or was charged with some serious assault; that Officer Donald Compton who is a detective with the Alamance County Sheriff's Department had come to the Randolph County Jail for the purpose of talking with Junior Bragg King concerning an incident which occurred in Alamance County sometime before 11 p.m. on the night of September 22. . . . That as Officer Compton talked with Mr. King, that Mr. King told him that he wanted to tell him what happened; that Officer Compton, as he went through the standard form—rights waiver form which his department uses, that he kept having to interrupt Mr. King and say, don't tell me what happened and let me explain the rights form; and that by the time that Officer Compton had finished reading the rights form to the defendant, he had substantially told the Officer his version of what he said had happened. Thereafter, the waiver form was signed and that he indicated on the form that he wanted a lawyer; that he had signed yes to the question do you want a lawyer; that Officer Hinshaw talked to the defendant at

the — sometime before 3:20 a.m. on the early morning hours of September 23rd, 1981, at the Randolph County Jail and explained the standard rights waiver — Miranda Rights Waiver Form to the defendant and the defendant signed the waiver form and told the Officer, Hinshaw, that he did want a lawyer; that after that, the defendant proceeded to tell the Officer what had happened; that the Assistant District Attorney, Mr. Roose, handling this case had a conversation at sometime past with the defense counsel which indicated that he had told the defense counsel that Mr. Hinshaw had asked some clarifying questions in the midst of the statement that Mr. King gave to him after having signed a Miranda form indicating he wanted a lawyer; that later, upon examination of Mr. Hinshaw, Mr. Roose, the Assistant District Attorney, found that Mr. Hinshaw had told him that he had not asked any clarifying questions during the statement made to Mr. Hinshaw by Mr. King; . . . .

Based upon these findings of fact, the trial court concluded that the statements made by defendant in the early morning hours of 23 September 1981 were not coerced and were voluntarily made.

Our review of the record convinces us that these findings of fact are amply supported by competent evidence. Likewise, the findings of fact support the conclusion of law that these statements, even if obtained in violation of defendant's *Miranda* rights, were voluntary and could properly be used to impeach defendant's testimony.

## IV.

[6] Defendant argues the trial judge erred in not excusing juror Wesley Winfield Evans for cause on the ground that the juror's hearing was impaired. *See* N.C. Gen. Stat. § 15A-1212(2). During defense counsel's voir dire Evans responded to a general question concerning whether any potential juror knew of a reason why he or she should not hear defendant's case as follows: "My only reason [for not wanting to hear the case] would be that I have a hearing problem and I don't hear every word or don't understand every word that is spoken. If it's pitched right I can." Evans again expressed this feeling to the court when the trial judge inquired further into the matter. After examining the juror, the trial court denied defendant's challenge of Evans for cause. De-

fendant then exercised a peremptory challenge and excused Evans. He preserved this question for appellate review by following the procedure in N.C. Gen. Stat. § 15A-1214(h).

The trial judge is empowered to decide all questions regarding the competency of jurors. N.C. Gen. Stat. § 9-14. His decision as to a juror's competency is a matter vested in his sound discretion and will be reversed only upon a demonstration that he abused this discretion. *See State v. Lee*, 292 N.C. 617, 234 S.E. 2d 574 (1977); *State v. Sweezy*, 291 N.C. 366, 230 S.E. 2d 524 (1976).

After observing and questioning Evans, the trial judge concluded that Evans' hearing was not so impaired as to prevent him from serving as a juror. There is a rational basis for this conclusion in the record. The juror stated he had understood what the lawyers had said during the voir dire; he had not understood the trial judge at first; he did understand the questions presently being put to him by the judge; and he could raise his hand during the proceeding if anything was said which he did not understand. The juror said, "The majority of people I can hear well enough, but sometimes I meet people that to me sounds [sic] like they are mumbling and I don't understand too well."

Although we think it the better practice for our trial judges freely to excuse any juror who has a genuine hearing impairment which in the juror's opinion would hamper his or her ability to perform a juror's duties, in this case we cannot say that the trial judge's failure to do so amounted to an abuse of his discretion.

## V.

[7] Defendant raises a number of issues relating to the admission of evidence. First, he challenges the denial of his motion to suppress the testimony of Weldon Garner. Defendant contends the state failed to present sufficient evidence of what occurred at Brown's trailer. We disagree.

The evidence tends to show that defendant threatened to kill both Brown and Callie Bittle because of jealousy engendered by their relationship. Garner testified that he saw Brown and Bittle sitting on the steps to Brown's trailer. Later that night, he observed defendant at the front door of Brown's trailer. Garner went into his own trailer and heard a loud noise from inside Brown's trailer. He heard another noise from inside Brown's

trailer and said to his wife, "That's a gunshot." He looked out the door of his trailer and saw defendant leave through the front door of Brown's trailer, pulling the door shut behind him. Garner then went to Brown's trailer and crawled through a window, because the door was locked. Brown was sitting on the floor bleeding and did not appear to be breathing. This testimony raises a reasonable inference that defendant shot Brown. Defendant testified that he shot Brown, although he claimed it occurred only after Brown "reached into his pocket."

Defendant seems to suggest that the state never demonstrated the relevancy of Garner's testimony. We believe this evidence is relevant on the issues of defendant's motive for shooting Bittle and the existence of a common scheme or plan. Although evidence of other crimes for which defendant is not on trial is generally inadmissible, there are exceptions. *See State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954). Among these are two which permit the use of evidence of other crimes (1) to prove a motive on the part of defendant to commit the crime charged even though it discloses the commission of another offense and (2) to establish a common plan or scheme embracing crimes so related to each other that proof of one tends to prove the crime charged and to connect the accused with its commission. *Id.* at 175-76, 81 S.E. 2d at 367. Garner's testimony relating to the events at Brown's trailer the night of the murder was admissible under both exceptions. Garner's testimony helped to establish a motive, jealousy, for Bittle's murder. This testimony and defendant's threats to both Brown and Bittle helped to show that both crimes arose out of a common scheme of defendant. Defendant's shooting of Brown in partial execution of the scheme tended to prove that he also shot Bittle in furtherance of his plan to shoot both.

[8] Second, defendant contends that the trial court committed reversible error by overruling his objection to Dr. Mary Steuterman's testimony that she performed the autopsy on Bittle. Dr. Steuterman, a forensic pathologist, described the procedures which she followed during the autopsy and described with particularity the various locations of the victim's wounds and injuries. Defendant essentially contends there was no foundation laid regarding the identity of the body upon which Dr. Steuterman performed the autopsy. This position is feckless.

Detective M. L. Hinshaw, who knew Bittle personally for a number of years, testified that he attended the autopsy and received a large caliber bullet which Dr. Steuterman removed from Bittle's abdomen. Detective Hinshaw's ability to identify Bittle's body and testimony about the autopsy laid a sufficient foundation for Dr. Steuterman's testimony concerning the autopsy.

[9] Third, defendant contends the court committed reversible error by overruling his objection to the results of tests performed on a pistol and rifle because a proper chain of custody was not shown.

In order for real evidence to be admitted, it is necessary to lay a proper foundation. This includes identifying the evidence as being the same as that involved in the incident and showing that since the incident occurred, the evidence has not undergone material change in condition. *See State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979); *State v. Harbison*, 293 N.C. 474, 238 S.E. 2d 449 (1977).

Officer Hill of the Liberty Police Department testified that he saw Officer Lineberry seize two weapons from defendant's car. He took the weapons and locked them in his locker to which he alone had a key. He later gave them to Detective Hinshaw. He identified these weapons during defendant's trial.

Detective Hinshaw also identified these weapons by noting that when he received them he scratched his initials in the rifle stock and placed the pistol in a plastic bag with a sticker containing its serial number. He identified a spent shell casing which he had removed from the rifle and said it was in the same condition as when he first observed it. He stated that he had packaged it in the same manner in which it appeared in court. He also identified a shell casing which he removed from the pistol. He testified that this particular casing had a crack in it at the left of the shell where it was bent as a result of being jammed in the slide of the pistol. Detective Hinshaw also identified the spent projectile which Dr. Steuterman gave him during the autopsy. He had observed Dr. Steuterman remove it from Bittle's body. Detective Hinshaw testified that he appropriately packaged, sealed, and marked each casing or shell and personally delivered them, along with the rifle and pistol, to the SBI laboratory in Raleigh for appropriate testing.

SBI Agent Douglas Branch testified that he received the shell and casings from his assistant, who had received them from another agent. Each was in a sealed container. He observed no indication of tampering or breaking of any seals or parts of the containers. Each was marked with Detective Hinshaw's initials. Following routine SBI policy, he opened each container at a place away from the seal in order to preserve the seal. Upon completion of his examination, he resealed each container and tagged the area where he had opened it. Branch further identified the rifle and the pistol as the weapons submitted to him for comparison. He testified that, as a result of his microscopic examinations, one casing and the shell had been fired from the rifle. The other casing had been fired from the pistol.

This evidence reveals that the state established a proper chain of custody of both the weapons seized from defendant's car and the projectile and casings. There was no material change in their condition from the seizure to the analysis and to the identification during the trial. Defendant's assignment of error is overruled.

## VI.

[10] Defendant assigns error to comments made by the court to the jury immediately before defendant testified. The court's statement, in short, was an inquiry to the jury concerning whether it would prefer to reconvene on Saturday or the following Monday. This inquiry became necessary when the trial judge realized the case could not be completed on Friday.

Our statutes prevent a judge from expressing any opinion in the presence of the jury on any question of fact to be decided by it during any stage of the trial. N.C. Gen. Stat. § 15A-1222. A remark by the court is not grounds for a new trial if, when considered in the light of the circumstances under which it was made, it could not have prejudiced defendant's case. *State v. Green*, 268 N.C. 690, 693-94, 151 S.E. 2d 606, 609 (1966). Nothing in these remarks made by the trial court can be construed as expressing an opinion on any fact involved in the case. Defendant's bare contention that they could have prejudiced his case by distracting the jury from defendant's testimony is completely without merit.

## VII.

Defendant moved for a mistrial at the close of the evidence. The trial court denied the motion, and defendant alleges error in this ruling. We disagree.

A trial judge must declare a mistrial upon defendant's motion if conduct or error occurs "resulting in substantial and irreparable prejudice to the defendant's case." N.C. Gen. Stat. § 15A-1061. A motion for mistrial under this section is addressed to the sound discretion of the trial judge. We will not reverse the trial judge's decision on appeal unless defendant demonstrates an abuse of discretion. *See State v. Craig,* 308 N.C. 446, 302 S.E. 2d 740 (1983); *State v. McCraw,* 300 N.C. 610, 268 S.E. 2d 173 (1980).

[11]  Defendant argues that a mistrial should have been declared because the prosecution failed to disclose, despite defendant's request for discovery, certain of his pretrial statements to Officers Lineberry and Compton. The admissibility of these statements was the subject of a lengthy voir dire at which both officers testified and were subject to cross-examination. Defendant on direct examination admitted he had made the statements about which Officer Lineberry testified. These statements were that he had shot Bittle and that the weapons were in his car. Defendant was cross-examined about statements made to Officer Compton which tended to be inconsistent with defendant's version of his shooting Brown.

Although defendant's oral statements to the officers fall within our discovery statute, *see* 15A-903(a)(2), and should have been disclosed by the state pursuant to defendant's request, sanctions for failure to comply with the discovery procedures, N.C. Gen. Stat. § 15A-910, are permissive and are imposed in the sound discretion of the trial judge. *State v. Dukes,* 305 N.C. 387, 390, 289 S.E. 2d 561, 563 (1982). Defendant himself was well aware of his pretrial statements to Lineberry and admitted in his own direct testimony having made them. Further, he had full opportunity to inquire about his statements to Compton on voir dire in the absence of the jury. There is no suggestion that defendant would not have testified had he been previously apprised of the state's contentions about his statements to Compton. We see no abuse of discretion under the circumstances in the trial court's

failure to exclude these statements. *State v. Stevens*, 295 N.C. 21, 243 S.E. 2d 771 (1978).

[12]   Defendant also argues for a mistrial on the ground of non-disclosure of his prior criminal record. Defendant was cross-examined regarding a 1966 conviction for "an affray with a deadly weapon." He alleges that this cross-examination was improper because the prosecution had failed to disclose, despite defendant's request, his prior criminal record. Defendant did not object to the cross-examination. Defendant had admitted on direct examination two prior convictions for assault with a deadly weapon in 1968. Under the circumstances we see no abuse of discretion in the trial court's denial of the mistrial motion insofar as it is based on cross-examination about the 1966 conviction.

Defendant also argues for a mistrial because the prosecution used Garner's testimony relating the events which occurred at Brown's trailer. As we previously stated, this evidence was relevant and admissible on the issues of defendant's motive and the existence of a common scheme or plan. It provides no basis for defendant's motion for mistrial.

Accordingly, we hold the trial court did not err in denying the mistrial motion.

## VIII.

Finally, defendant contends the trial court erred in charging the jury regarding motive. Defendant concedes these instructions are a correct statement of the law, but he argues the state offered no evidence of motive. As we have previously noted, there is ample evidence of defendant's motive in this case. Accordingly, the court did not err in explaining the law of motive to the jury.

In conclusion, defendant received a fair trial free from prejudicial error. Accordingly, in the judgment and conviction we find

No error.