**STATE v. LOVETTE**

[225 N.C. App. 456 (2013)]

━━━━━━━━━━

STATE OF NORTH CAROLINA
v.
LAURENCE ALVIN LOVETTE, JR.

No. COA12-794

Filed 5 February 2013

**1. Robbery—armed—indictment—person from whom property taken—not named**

An indictment for armed robbery that did not name the person from whom the property was taken was sufficient to convey subject matter jurisdiction. By alleging that defendant took and carried away "another's personal property," this indictment negated the idea that defendant was taking his own property. Moreover, the indictment named the person whose life was endangered by the threatened use of firearms.

**2. Jury—selection—questions regarding interested witnesses— witnesses with criminal backgrounds**

There was no abuse of discretion in a prosecution for murder, kidnapping, and robbery where the trial court overruled defendant's objections to questions asked of prospective jurors about testimony from witnesses with criminal backgrounds or about their feelings regarding felony murder. These were attempts to determine the prospective jurors' abilities to follow the law and not reject out of hand the testimony of interested witnesses or

those with criminal records, not hypothetical questions intended to stake out the jurors.

### 3. Jury—selection—hearing impaired prospective juror

The trial court did not abuse its discretion in a prosecution for murder, kidnapping, and robbery by denying defendant's request to excuse a prospective juror for cause based on his hearing where the court obtained a hearing device for the juror, tested the device in the courtroom, and the court gave a logical and thoughtful explanation of its ruling.

### 4. Constitutional Law—effective assistance of counsel—no actual concession of guilt

The trial court did not receive ineffective assistance of counsel through a concession of guilt where absolutely nothing in counsel's comment could be reasonably construed as suggesting that defendant would be found guilty, let alone a concession that he *should* be found guilty.

### 5. Sentencing—life imprisonment for juvenile—remanded— new statute

A sentence of life imprisonment without parole for a defendant who was 17 years old when the crime was committed was remanded for a new sentencing hearing where defendant's direct appeal was pending when N.C.G.S. § 15A-1476 was enacted to comply with a U.S. Supreme Court decision.

Appeal by Defendant from judgments entered 20 December 2011 by Judge R. Allen Baddour in Orange County Superior Court. Heard in the Court of Appeals 12 December 2012.

*Attorney General Roy Cooper, by Assistant Attorney General Amy Kunstling Irene, for the State.*

*Cheshire Parker Schneider & Bryan, PLLC, by John Keating Wiles, for Defendant.*

STEPHENS, Judge.

*Procedural History and Evidence*

This appeal arises from Defendant's conviction of participating in the March 2008 kidnapping, robbery, and murder of Eve Marie Carson, then president of the student body at the University of North Carolina at Chapel Hill ("UNC"). The evidence at trial tended to show

the following: On 5 March 2008, Carson lived in a house at 202 Friendly Lane in Chapel Hill with three fellow UNC students. One of her roommates saw Carson when he stopped by their house about 1:30 that morning. At that time, Carson was sitting in the living room working on a class paper. No one else was in the house. Carson's car, a Toyota Highlander SUV, was parked in the driveway. When the roommate returned to the house around 4:30 a.m., Carson, her laptop computer, and her car were gone.

About 5:00 a.m., officers from the Chapel Hill Police Department ("CHPD") responded to a 911 call about gunshots and a young woman yelling in the area of Hillcrest Drive. The officers discovered a woman's body lying in the road in the area of Hillcrest Drive and Hillcrest Circle. The woman, later identified as Carson, was dead, having suffered multiple gunshot wounds. Four .25 caliber shell casings were found near the body.

On 6 March 2008, officers investigating the murder released a still image of a suspect from bank video surveillance footage from an ATM where Carson's card had been used on the morning of and the day following her death. The image, which was shown on local television newscasts, showed an African-American male in an SUV with two passengers.

On 12 March 2008, Shanita Love of Durham contacted law enforcement officers with information about the Carson case, which led to the arrest of Defendant. Defendant was subsequently indicted on charges of first-degree murder, first-degree kidnapping, felonious larceny, felonious possession of stolen goods, and robbery with a dangerous weapon.

The case came on for trial at the 28 November 2011 criminal session of superior court in Orange County. At trial, Love testified on behalf of the State. Love testified that she and her children lived in an apartment in Durham with Demario Atwater and his mother, sister, and three brothers. Defendant was a friend of Atwater's siblings and often stopped by the apartment. On 4 March 2008, Atwater left the apartment after 10:00 p.m. and returned about 5:30 the next morning. Later, when Atwater saw the still image from the bank surveillance footage on television, he called Defendant into the room and told him that his picture was on the news. Defendant replied, "Oh, s—t," asked to use the phone, and left. On 8 March 2008, Love accompanied Atwater, his brother, and Defendant as they disposed of pieces of a .25 caliber handgun. On the same day, Atwater and Defendant broke

up a sawed-off shotgun on some bricks and put the pieces into grocery bags, which Atwater disposed of.

Defendant's acquaintance Jayson McNeil testified that Defendant called him on 4 March 2008 and asked McNeil to drive Defendant and Atwater to Chapel Hill. McNeil was busy and not able to provide the ride. Defendant called McNeil again on 12 March 2008 and asked McNeil to come and pick him up. Defendant told McNeil that he was anxious to get out of the area because Atwater was "going to tell." When McNeil testified that, when he asked Defendant what he meant, Defendant

> explained to me on the night that he called my cell phone—explained to me letting me know that the night they needed a ride to Chapel Hill was the reason. And he also explained to me that when they got—him and [Atwater] had gotten the car. They no longer needed my car—a ride, and they had borrowed his mother's PT Cruiser—purple PT Cruiser and went to Chapel Hill.
>
> And they explained to me that they seen Eve Carson get in her car, and they rushed the car—rushed towards her car. Him and [Atwater] got out his mother's car and they rushed the car. And when they rushed and got in the car, they explained to me—[Defendant] explained that he got in the driver's seat and [Atwater] had gotten in the back seat and had Eve Carson hostage with the gun to her head.
>
> And then he also explained to me leaving—he explained to me leaving. They left there and made threats to her about the card, the ATM machine card. And he said the whole time Eve Carson was in the back seat, she was pleading for her life and explained that they didn't have to do what they was doing. And he also explained to me that they went to a store to use the card, to the way it had happened. And he also explained how it happened, how they used the card and how [Atwater] was in the back. [Atwater] was fiddling with her clothes and touching her in certain parts of her body.
>
> And he also explained to me going to—after this, explained to me about them going to somewhere in the woods, if I'm not mistaken, and to where she was plead-

ing with them, begging for her life, explaining that they didn't have to do what they were doing; that they could take whatever they want. They didn't have to do what they were doing.

And he explained to me—and I asked him—I said, "so what led to y'all murdering her?" And he explained to me because that she had seen their face. And then he explained to me how they—how they murdered her. He explained to me that he shot her five times with a .25 caliber. And then he explained to me that she was still alive; that she took the bullets, and she ate them without—and she was still alive. She was still moving and stuff. And he explained to me that . . . Atwater stood over top of her with a .410 gauge, and if I'm not mistaken, he told me he shot her in the chest. And when he explained shooting her in the chest, he said he no longer heard anything out of her. She was dead.

Other evidence linking Defendant to the crime included a match between Defendant's DNA profile and the DNA profile of a swabbing taken of the interior driver's side door panel of Carson's SUV and footwear impressions from receipts found in the interior of the vehicle which were consistent with Defendant's shoes.

Defendant did not present any evidence. The jury returned verdicts of guilty on all charges. The trial court sentenced Defendant to life imprisonment without the possibility of parole for the first-degree murder conviction, and consecutive terms of 100 to 129 months and 77 to 102 months for the first-degree kidnapping and robbery with a dangerous weapon convictions. The court arrested judgment on the felonious larceny and felonious possession of stolen goods convictions. Defendant gave oral notice of appeal in open court.

On 29 August 2012, Defendant filed a motion for appropriate relief ("MAR") with this Court, seeking remand for resentencing on his first-degree murder conviction pursuant to *Miller v. Alabama*, ___ U.S. ___, 183 L. Ed. 2d 407 (2012). On 6 September 2012, the State filed a response to Defendant's MAR, conceding that, in light of *Miller* and subsequently-enacted state statutes, Defendant must be resentenced. The MAR was referred to this panel for decision.

## Discussion

In his direct appeal, Defendant brings forward four arguments: (1) that his robbery with a dangerous weapon indictment was fatally defective, (2) that the trial court abused its discretion in overruling Defendant's objections to certain questions asked by the State during jury selection, (3) that the trial court abused its discretion by denying three of Defendant's challenges for cause during jury selection, and (4) that Defendant received ineffective assistance from his trial counsel. We find no error in Defendant's trial. However, as discussed herein, we allow Defendant's MAR, vacate his sentence on the first-degree murder conviction, and remand to the trial court for a new sentencing hearing.

### I. Robbery with a Dangerous Weapon Indictment

Defendant first argues that the trial court lacked subject matter jurisdiction to try him for robbery with a dangerous weapon because the indictment on that charge failed to name the person from whose presence property was taken and, as a result, was fatally defective. We disagree.

We review the question of an alleged defect in a criminal indictment *de novo. State v. Marshall,* 188 N.C. App. 744, 748, 656 S.E.2d 709, 712 (2008).

> A valid bill of indictment is essential to the jurisdiction of the Superior Court to try an accused for a felony and have the jury determine his guilt or innocence, and to give authority to the court to render a valid judgment. . . . North Carolina law has long provided that there can be no trial, conviction, or punishment for a crime without a formal and sufficient accusation. In the absence of an accusation the court acquires no jurisdiction whatsoever, and if it assumes jurisdiction a trial and conviction are a nullity. In other words, an indictment must allege every element of an offense in order to confer subject matter jurisdiction on the court.

*Id.* at 748, 656 S.E.2d at 712-13 (citations, quotations marks, and emphasis omitted).

The elements of robbery are "1) the unlawful taking or attempt to take personal property from the person or in the presence of another; 2) by use or threatened use of a firearm or other dangerous weapon;

[and] 3) whereby the life of a person is endangered or threatened." *State v. Wiggins*, 334 N.C. 18, 35, 431 S.E.2d 755, 765 (1993).

> [I]t is not necessary that ownership of the property be laid in a particular person in order to allege and prove . . . robbery. . . . An indictment for robbery will not fail if the description of the property is sufficient to show it to be the subject of robbery and negates the idea that the accused was taking his own property.

*State v. Jackson*, 306 N.C. 642, 654, 295 S.E.2d 383, 390 (1982) (citation and quotation marks omitted); *see also State v. Rankin*, 55 N.C. App. 478, 479-80, 286 S.E.2d 119, 119-20 (holding that a robbery indictment is sufficient so long as it alleges the victim's life was threatened with the weapon and puts the defendant on notice of the substance of the offense), *appeal dismissed and disc. review denied*, 305 N.C. 590, 292 S.E.2d 11 (1982). Thus, "[w]hile . . . an indictment for armed robbery need not allege actual legal ownership of property, . . . the indictment must at least name a person who was in charge or in the presence of the property at the time of the robbery, if not the actual, legal owner." *State v. Moore*, 65 N.C. App. 56, 62, 308 S.E.2d 723, 727 (1983) (citations omitted).

Here, the indictment for robbery with a dangerous weapon was a preprinted form with blanks to be filled in and alleged that Defendant

> unlawfully, willfully and feloniously did steal, take, and carry away and attempt to steal, take and carry away another's personal property, <u>A 2005 TOYOTA HIGH-LANDER AUTOMOBILE (VIN: JTEDP21A250047971) APPROXIMATE VALUE OF $18,000.00; AND AN LP[1] FLIP PHONE, HAVING AN APPROXIMATE VALUE OF $100.00; AND A BANK OF AMERICA ATM CARD, HAVING AN APPROXIMATE VALUE OF $1.00; AND APPROXIMATELY $700.00 IN U.S. CURRENCY</u> of the value of $18,801.00 dollars, from the presence, person, place of business, and residence of_____
> _____. The defendant committed this act having in possession and with the use and threatened use of firearms and other dangerous weapons, implements, and means, <u>A SAWED OFF HAR-</u>

---

1. Although the indictment lists an "LP" flip phone, this may be a clerical error as a popular brand of cellular phone at the time of Carson's murder was an "LG" flip phone.

RINGTON & RICHARDSON TOPPER MODEL 158, 12 GAUGE SHOTGUN (SERIAL # L246386) AND AN EXCAM GT-27 .25 CALIBER SEMI-AUTOMATIC PISTOL (SERIAL # M11062) whereby the life of EVE MARIE CARSON was endangered and threatened.

By alleging that Defendant took and carried away "another's personal property," this indictment "negates the idea that [Defendant] was taking his own property." *Jackson*, 306 N.C. at 654, 295 S.E.2d at 390 (citation omitted). The indictment also specifies that Defendant "committed this act having in possession and with the use and threatened use of firearms and other dangerous weapons, implements, and means . . . whereby the life of EVE MARIE CARSON was endangered and threatened." Plainly, Carson's life could not have been "endangered and threatened" unless she was the one in the presence of the property when Defendant "committed this act[.]" Thus, the indictment sufficiently names the "person who was in charge or in the presence of the property at the time of the robbery," *Moore*, 65 N.C. App. at 62, 308 S.E.2d at 727, to give the trial court subject matter jurisdiction over the matter. Accordingly, Defendant's argument is overruled.

*II. Questions by the State During Jury Selection*

Defendant next argues that the trial court abused its discretion in overruling his objections to certain questions asked by the State during jury selection. We disagree.

> In reviewing any jury *voir dire* questions, [an appellate c]ourt examines the entire record of the *voir dire*, rather than isolated questions. It is well established that the right of counsel to inquire into the fitness of prospective jurors is subject to close supervision by the trial court. The regulation of the manner and the extent of the inquiry rests largely in the discretion of the trial court. The exercise of such discretion constitutes reversible error only upon a showing by the defendant of harmful prejudice and clear abuse of discretion by the trial court.

*State v. Jones*, 347 N.C. 193, 203, 491 S.E.2d 641, 647 (1997) (citations omitted).[2]

---

2. Unlike Defendant here, the defendant in *Jones* did not object at trial to the questions later challenged on appeal. *Id.* at 202, 491 S.E.2d at 647.

In *Jones*, our Supreme Court summarized the bounds of permissible jury *voir dire* questions:

> On the *voir dire* . . . of prospective jurors, hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed. Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts. In the first place, such questions are confusing to the average juror who at that stage of the trial has heard no evidence and has not been instructed on the applicable law. More importantly, such questions tend to "stake out" the juror and cause him to pledge himself to a future course of action. This the law neither contemplates nor permits. The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts.

> Hypothetical questions that seek to indoctrinate jurors regarding potential issues before the evidence has been introduced and before jurors have been instructed on applicable principles of law are similarly impermissible. These prohibitions are founded in the constitutional right of a criminal defendant to trial by an impartial jury. However, the right to an impartial jury contemplates that each side will be allowed to make inquiry into the ability of prospective jurors to follow the law. Questions designed to measure a prospective juror's ability to follow the law are proper within the context of jury selection *voir dire*.

*Id.* at 202-03, 491 S.E.2d at 647 (citations omitted). In *Jones*, the State had asked prospective jurors about their ability to consider the testimony of witnesses who had received plea deals in exchange for their cooperation: " 'After having listened to that testimony and the court's instructions as to what the law is, and you found that testimony believable, could you give it the same weight as you would any other uninterested witness? Anyone that could not do that?' " *Id.* at 202, 491 S.E.2d at 646. The Court held that these questions were not attempts to "stake out" jurors, but rather "merely inquired into the ability of prospective jurors first to consider the testimony of an interested wit-

ness and the instructions of the trial court relative thereto, and then to give it the same weight as the testimony of any other witness if they found the testimony credible." *Id.* at 204, 491 S.E.2d at 648. As a result, the Court found no abuse of discretion. *Id.*

Here, Defendant objected to the State's questions about whether jurors could "consider" testimony by witnesses who had criminal records, had received immunity deals for their testimony, and/or were uncharged participants in some of the criminal activities described at trial.[3] Defendant also objected to questions about the jurors' understanding of and feelings about the substantive law on felony murder. As in *Jones*, these were not "hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts[,]" but instead were attempts to determine the "prospective jurors' abilities to follow the law" and not reject out of hand the testimony of interested witnesses or those with criminal records.[4] *Id.* at 202-03, 491 S.E.2d at 647. We see no abuse of discretion by the trial court in overruling Defendant's objections to these questions. Accordingly, this argument is overruled.

*III. Defendant's Challenges for Cause During Jury Selection*

Defendant also argues that the trial court abused its discretion by denying three of Defendant's challenges for cause during jury selection. We disagree.

> [Section] 15A-1214(h) [of our General Statutes] prescribes the only method of preserving for appellate review a denial of a challenge for cause. Counsel must first have exhausted his peremptory challenges, must have renewed for cause as to each prospective juror whose previous challenge for cause had been denied, and must have had his renewed motion denied as to the juror in question.

---

3. Questions by the State to which Defendant objected included: "Can you consider the testimony of witnesses with criminal records in order to reach a verdict?" and "Can you consider testimony of witnesses who were in essence accessories after the fact in order to reach a verdict?"

4. Our case law is clear that if, after taking into account a witness's interest in a case, a juror believes the witness to be credible, she should treat the interested witness's testimony in the same manner as any other believable evidence. *State v. Larrimore*, 340 N.C. 119, 167, 456 S.E.2d 789, 815 (1995).

*State v. Roseboro*, 351 N.C. 536, 544, 528 S.E.2d 1, 7, *cert. denied*, 531 U.S. 1019, 148 L. Ed. 2d 498 (2000). These provisions are mandatory, and a request for additional peremptory challenges is no substitute for following the statutory procedures. *Id.* at 545, 528 S.E.2d at 7.

Here, Defendant challenged prospective jurors 2 and 5. The trial court overruled his challenges to both jurors, and Defendant then excused each juror using peremptory challenges. Defendant then challenged prospective juror 12 for cause, which the trial court also overruled. At that point, because he had already exhausted his allotted peremptory challenges, Defendant asked for an additional peremptory challenge. The court denied this request, and defense counsel responded, "Then we can't do anything except accept him." However, Defendant never renewed his challenges for cause as to prospective jurors 2 or 5. Accordingly, he has not preserved for appellate review his arguments as to his challenges of those jurors.

Where properly preserved for appellate review, "the trial court's ruling on a challenge for cause will not be overturned absent abuse of discretion." *State v. Quick*, 329 N.C. 1, 17, 405 S.E.2d 179, 189 (1991). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Wilson*, 313 N.C. 516, 538, 330 S.E.2d 450, 465 (1985).

One ground for a challenge for cause is that a prospective juror "[i]s incapable by reason of . . . physical infirmity of rendering jury service." N.C. Gen. Stat. § 15A-1212(2) (2011). Our Supreme Court has observed that "the better practice [is] for our trial judges freely to excuse any juror who has a genuine hearing impairment which in the juror's opinion would hamper his or her ability to perform a juror's duties[.]" *State v. King*, 311 N.C. 603, 615, 320 S.E.2d 1, 9 (1984). However, the Court found no abuse of discretion in the trial court's failure to excuse a prospective juror in *King*, even though the prospective juror said twice he should not hear the case because of his poor hearing and reported during *voir dire* that " 'sometimes I meet people that to me sounds [sic] like they are mumbling and I don't understand too well.' " *Id.*

Here, the basis for Defendant's challenge for cause to prospective juror 12 was that the juror "had problems hearing[.]" The juror admitted that his age caused him to sometimes have difficulty hearing voices over background noise. The trial court then obtained a listening device for the prospective juror's use. During *voir dire*, both the

prosecutor and defense counsel made a point of asking questions while facing away from the prospective juror to ascertain whether he could hear without reading lips. In ruling on Defendant's challenge for cause, the court explained:

> All right. It did not appear to the Court that he had any trouble. I think he didn't hear one word that [defense counsel] used, and it was slightly muddled, frankly, in her speaking it, not in the direction she spoke it. And I think that is as likely to happen to any juror as it is to [prospective juror 12]. In other words, I think he can hear and understand the proceedings with the assistance of the listening device, and I did not observe him having any abnormal amount of difficulty in doing so. So that motion is denied.

This response does not remotely suggest a ruling "so arbitrary that it could not have been the result of a reasoned decision[,]" *Wilson*, 313 N.C. at 538, 330 S.E.2d at 465 (citation omitted), but rather, a logical and thoughtful decision by the trial court. Thus, as in *King*, Defendant has failed to show an abuse of discretion. Accordingly, this argument is overruled.

### IV. Ineffective Assistance of Counsel

Finally, Defendant argues that he received ineffective assistance from his trial counsel. Specifically, Defendant contends that his trial counsel conceded his guilt to the jury without his consent. We disagree.

> When counsel admits his client's guilt without first obtaining the client's consent, the client's rights to a fair trial and to put the State to the burden of proof are completely swept away. The practical effect is the same as if counsel had entered a plea of guilty without the client's consent. Counsel in such situations denies the client's right to have the issue of guilt or innocence decided by a jury.

> For the foregoing reasons, we conclude that ineffective assistance of counsel, per se in violation of the Sixth Amendment, has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent.

*State v. Harbison,* 315 N.C. 175, 180, 337 S.E.2d 504, 507-08 (1985) (citation omitted), *cert. denied,* 476 U.S. 1123, 90 L. Ed. 2d 672 (1986).

Here, during her initial closing argument, one of Defendant's trial attorneys gave the jury a summary of the final proceedings of the guilt-innocence phase of Defendant's trial:

> Good morning. We're just about completed the book that I was telling you about in my opening statement. You will write the final chapter which is the conclusion of state's evidence against Laurence Lovette. At the conclusion of our arguments, which are not evidence as the judge tells you, but are looking at the evidence in trying to assist you in reaching a verdict. Verdict is Latin for speaking the truth.

> The judge will give you what is called final jury instructions. And he will tell you about the—what you should find as far as the law is applied to whatever you find the facts are in the case, based upon your decisions.

> There will be a verdict sheet on first degree murder, a verdict sheet on robbery with a firearm, kidnapping, and stolen goods—felonious stolen goods, possession. And those are the charges that Mr. Lovette has been charged with. That's what you've been here sitting in court to try to figure out whether or not he's guilty or not guilty based on the state's evidence in this case.

> You will remember that I talked to you about certain promises that you made on *voir dire,* to listen to the law and certain concepts such as presumption of innocence. We're about finished with that when you reach a verdict.

> And reasonable doubt and credibility of witnesses. The judge will give you the instructions on exactly what that means. And listen very carefully to him, and that will assist you in trying to figure out and filter through all the evidence that the state has presented.

> The state has the burden of proof of showing all the elements in each and every offense has been proven sufficiently with credible evidence beyond a reasonable doubt.

> The elements are like ingredients to a cake or something you want to bake. If you don't have the correct

ingredients, it will not come out. If the state has not met its burden of proof in reaching all the elements beyond a reasonable doubt, it is your duty to return a verdict of not guilty. That's our how our system works.

The judge will tell you what the law is, and you will talk and deliberate among yourselves and come back with a unanimous verdict that you all agree on. That means each and every one of you has a vote, and each and every one of you is important.

I'm going to sit down now, but I will be back—I know you're waiting—to give a closing argument. In the meantime, the state will give its closing arguments, and then [Defendant's other trial counsel] will come back, and then I will come back on behalf of Mr. Lovette.

I want to thank you again for your attention and your patience and, obviously, your interest in trying to do what you should do as jurors and keep an open mind in this case. Thank you very much.

Defendant draws our attention to the remark "You will remember that I talked to you about certain promises that you made on *voir dire*, to listen to the law and certain concepts such as the presumption of innocence. We're about finished with that when you reach a verdict." Defendant contends his counsel "implicitly conceded that the jury would finish with the concept of [Defendant's] presumption of innocence and find him guilty[.]" Even taken out of context and considered in isolation, we are not persuaded that this remark even approaches a concession of guilt. Read in the context of her entire initial closing statement, much less in the context of all three of the defense's closing statements, not even the most tortured reading of defense counsel's comment could lead to the interpretation suggested by Defendant. Rather, it is plain that defense counsel was merely remarking in passing that the end of the trial was growing near and that the jury would soon be past a focus on legal concepts. Absolutely nothing in the comment can be reasonably construed as suggesting that Defendant would be found guilty, let alone a concession that he *should* be found guilty. This argument utterly lacks merit, and accordingly, it is overruled.

*V. Defendant's MAR*

In his MAR, Defendant seeks a new sentencing hearing, citing *Miller*. In *Miller*, which was decided after Defendant was sentenced, the United States Supreme Court held that imposition of a *mandatory* sentence of life without the possibility of parole for a defendant who was under the age of eighteen when he committed his crime violates the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at ___, 183 L. Ed. 2d at 414-15. After noting scientific studies that reveal differences in brain function and other psychological and emotional factors between adults and juveniles, the Court held that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at ___, ___, 183 L. Ed. 2d at 418-19, 430.

In response to the *Miller* decision, our General Assembly enacted N.C. Gen. Stat. § 15A-1476 *et seq.* ("the Act"), entitled "An act to amend the state sentencing laws to comply with the United States Supreme Court Decision in *Miller v. Alabama*." N.C. Sess. Law 2012-148.[5] The Act applies to defendants convicted of first-degree murder who were under the age of eighteen at the time of the offense. N.C. Gen. Stat. § 15A-1340.19A. Section 15A-1340.19B(a) provides that if the defendant was convicted of first-degree murder *solely* on the basis of the felony murder rule, his sentence shall be life imprisonment with parole.[6] N.C. Gen. Stat. § 15A-1340.19B(a)(1) (2012). In all other cases, the trial court is directed to hold a hearing to consider any mitigating circumstances, *inter alia*, those related to the defendant's age at the time of the offense, immaturity, and ability to benefit from rehabilitation. N.C. Gen. Stat. §§ 15A-1340.19B, 15A-1340.19C. Following such a hearing, the trial court is directed to make findings on the presence and/or absence of any such mitigating factors, and is given the discretion to sentence the defendant to life imprisonment either with or without parole. N.C. Gen. Stat. §§ 15A-1340.19B(a)(2), 15A-1340.19C(a). "[N]ew rules of criminal procedure [such as the Act] must be applied retroactively 'to all cases, state or federal, pending on direct review or not yet final.' " *State v. Zuniga*, 336 N.C. 508, 511,

---

5. The Act became effective when passed on 12 July 2012. N.C. Sess. Law 2012-148, Section 3. Session Law 2012-148 designated this Act as sections 15A-1476 *et seq.*, but the Act was later redesignated and renumbered at the direction of the Revisor of Statutes and is now found at N.C. Gen. Stat. § 15A-1340.19A *et seq.*

6. Life imprisonment with parole is defined in the Act as the defendant serving "a minimum of 25 years imprisonment prior to becoming eligible for parole." N.C. Gen. Stat. § 15A-1340.19A (2012).

444 S.E.2d 443, 445 (1994) (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661 (1987)).

Here, as conceded by the State, the Act applies to Defendant, who was seventeen years old at the time of Eve Carson's murder and whose case was pending on direct appeal when the Act became law. In addition, Defendant's jury returned a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation, as well as the felony murder rule. Accordingly, we must vacate Defendant's sentence of life imprisonment without parole and remand to the trial court for resentencing as provided in the Act. Following a resentencing hearing, the trial court shall, in its discretion, determine the appropriate sentence for Defendant and make findings of fact in support thereof.

NO ERROR IN TRIAL; REMANDED FOR RESENTENCING.

Judges STEELMAN and McCULLOUGH concur.