STATE OF NORTH CAROLINA v. WALLACE BRANDON JONES

No. 557A95

(Filed 3 October 1997)

### 1. Jury § 123 (NCI4th)— voir dire—prosecutor's interested witness question—propriety

The prosecutor's questions to prospective jurors in a first-degree murder and armed robbery trial inquiring into the ability of the jurors to consider the testimony of an interested witness, who testified pursuant to a plea bargain, to follow the court's instructions as to how to view that testimony, and to give it the same weight as the testimony of any other witness if they found the testimony credible did not misinform the jurors about applicable law or constitute an attempt to "stake out" the jurors on the verdict they would render. Therefore, the trial court did not abuse its discretion in failing to intervene *ex mero motu*.

**Am Jur 2d, Jury § 208.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

### 2. Evidence and Witnesses § 3081 (NCI4th)— prior inconsistent statement—flight of defendant—impeachment

Where a defense witness denied on cross-examination that she had notified law enforcement authorities of defendant's flight to another state, a deputy sheriff's testimony on rebuttal that the witness had told her that defendant had been taken to Tennessee by a third person was properly admitted for the purpose of impeaching the witness's in-court testimony on the material issue of defendant's flight from authorities.

**Am Jur 2d, Witnesses § 938.**

3. **Evidence and Witnesses § 742 (NCI4th)— hearsay testimony—not prejudicial error**

The admission of a deputy's unsolicited and brief hearsay testimony in a murder and robbery trial that a witness told him that she had seen what appeared to be blood in the bathtub in defendant's trailer did not constitute prejudicial error requiring a new trial in light of the extensive evidence of defendant's guilt, including testimony by defendant's girlfriend, an eyewitness, and substantial other evidence corroborating her account of the murder.

**Am Jur 2d, Appellate Review §§ 713, 752, 755, 761.**

**Effect of voluntary statements damaging to accused, not proper subject of testimony, uttered by testifying police or peace officer. 8 ALR2d 1013.**

4. **Criminal Law § 390 (NCI4th Rev.)— court's direction to witness—not expression of opinion**

When defense counsel asked a State's witness on cross-examination about a statement attributed to him in notes prepared by law enforcement authorities, the witness was asked to read the notes, and the witness stated in response to a question by the court that he had not read all of the notes, the trial court's direction to the witness to read all of the notes "because I'm sure he's going to ask you lots of questions on what's in those papers" did not constitute an expression of opinion that defendant's counsel was going to waste time by his forthcoming questions but was a proper admonition to the witness to answer the question he had been asked and to do what was requested.

**Am Jur 2d, Trial §§ 299, 302, 304.**

5. **Criminal Law § 379 (NCI4th Rev.)— court's comment to counsel—not demeaning—no impropriety**

The trial court's comment to defense counsel, "you don't ask the witness questions when he's being examined by the State," was within the proper bounds of the court's duty to control the examination of witnesses, was not demeaning to defense counsel, and was not an expression of opinion on the evidence.

**Am Jur 2d, Trial §§ 302, 316.**

**Remarks or acts of trial judge criticizing, rebuking, or punishing defense counsel in criminal case, as requiring new trial or reversal. 62 ALR2d 166.**

**6. Criminal Law § 379 (NCI4th Rev.)— court's comment to counsel—not demeaning—no error**

The trial court's comment to defense counsel, while sustaining defense counsel's objection to a question by the prosecutor, "You don't have to make speeches. . . . Just file your objections," although inappropriate, cannot reasonably be interpreted as demeaning or belittling counsel before the jury and was not error, either in isolation or in conjunction with other comments by the court.

**Am Jur 2d, Trial §§ 302, 316.**

**Remarks or acts of trial judge criticizing, rebuking, or punishing defense counsel in criminal case, as requiring new trial or reversal. 62 ALR2d 166.**

**7. Criminal Law § 386 (NCI4th Rev.)— court's comment to counsel—not demeaning—no impropriety**

When told by one defense counsel that the other defense counsel had not finished cross-examining a witness, the trial court's comments that "he thanked him. You don't need to thank a witness for his answer. I'll let him ask some more questions; but, do not thank a witness for his answer. Ask the next questions, and let's move along," were a proper effort to move the proceedings along, did not demean defense counsel, and did not constitute an expression of opinion on the evidence.

**Am Jur 2d, Trial §§ 302, 316.**

**Remarks or acts of trial judge criticizing, rebuking, or punishing defense counsel in criminal case, as requiring new trial or reversal. 62 ALR2d 166.**

**8. Criminal Law § 384 (NCI4th Rev.)— court's comment to counsel—prohibition of repetitive questioning—not expression of opinion**

The trial court's comment to defense counsel that a witness had "been asked and answered that once" was a proper effort by the trial court to prohibit repetitive questioning and did not constitute an expression of opinion where defense counsel received the answer he sought.

**Am Jur 2d, Trial §§ 302, 304.**

**9. Criminal Law § 384 (NCI4th Rev.)— court's comments— prevention of repetitive questioning—not expression of opinion**

The trial court did not express an opinion but was properly attempting to prevent repetitive questioning (1) when defense counsel asked a witness to repeat an answer, the trial court asked why counsel asked the witness to repeat the answer, the jury responded affirmatively when the trial court asked whether the jury had heard the answer, and the court instructed counsel to "ask the next question," and (2) after counsel asked repetitive questions, the court stated that the witness said he didn't observe anything and asked, "How many times does he have to say it?"

**Am Jur 2d, Trial §§ 302, 304.**

**10. Evidence and Witnesses § 173 (NCI4th)— bad dream— emotional state of witness—relevancy**

An accomplice's testimony about a bad dream she had immediately after her arrest was relevant in this first-degree murder trial to establish the emotional state underlying the accomplice's reason for recanting in her diary her earlier implication of defendant in the victim's murder where the accomplice claimed that her recantations were based on fear caused by what she had done and of persons who had threatened to kill her if she testified against defendant.

**Am Jur 2d, Evidence §§ 556, 558.**

**11. Appeal and Error § 155 (NCI4th)— objection sustained— absence of motion to strike—waiver of appeal rights**

Where a trial court sustains a defendant's objection, and the defendant fails to move to strike the objectionable testimony, defendant waives his right to assert on appeal error arising from the objectionable testimony.

**Am Jur 2d, Appellate Review §§ 614, 690.**

**12. Evidence and Witnesses § 873 (NCI4th)— cellmate's statements—not hearsay—admission not abuse of discretion or plain error**

An accomplice's testimony in a murder trial about her cellmate's out-of-court statements was not hearsay where the testimony was not offered to prove the truth of any matter asserted within the statements but rather to explain why the accomplice

had recanted her earlier statements implicating defendant in the murder. Furthermore, the statements would not support an inference that defendant's counsel had improperly attempted to manipulate the accomplice's testimony by communicating with her through the cellmate, and the admission of the statements did not constitute an abuse of discretion under Rule 403 or plain error.

## Am Jur 2d, Evidence §§ 661, 666.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by Brown (Franklin R.), J., at the 18 September 1995 Criminal Session of Superior Court, Washington County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for robbery with a dangerous weapon was allowed 30 July 1996. Heard in the Supreme Court 14 February 1997.

*Michael F. Easley, Attorney General, by Jill Ledford Cheek, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant, Wallace Brandon Jones, was indicted on 9 January 1995 for first-degree murder and on 21 August 1995 for robbery with a dangerous weapon. He was tried capitally to a jury at the 18 September 1995 Criminal Session of Superior Court, Washington County, Judge Franklin R. Brown presiding. The jury found defendant guilty of robbery with a dangerous weapon and of first-degree murder on the basis of malice, premeditation and deliberation and under the felony murder rule. After a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment for the first-degree murder conviction. Judge Brown sentenced defendant to a mandatory term of life imprisonment, plus an additional forty years for the robbery with a dangerous weapon conviction. Defendant appeals to this Court as of right from the first-degree murder conviction, and defendant's motion to bypass the Court of Appeals on the robbery conviction was allowed.

**STATE v. JONES**

[347 N.C. 193 (1997)]

The State's evidence tended to show that on Saturday, 18 December 1993, the victim, William Frank Swain, was seen by a relative carrying approximately one thousand dollars in cash. The victim was known in the area around Plymouth, North Carolina, to be a drug dealer and was referred to as "the crack man." He typically carried a large roll of money and also carried money in a Velcro wallet that he kept in his back pocket. The victim lived in Freeman's Trailer Park on Folly Road in Plymouth.

On the afternoon of 18 December 1993, defendant; defendant's girlfriend, Dana Lynn Maybin; and defendant's friend Leroy Spruill went to the victim's home for the purpose of obtaining drugs. Defendant procured drugs from the victim and returned to a truck where Maybin and Spruill were waiting. The three then proceeded to Big Ed's Bar, a place they frequented often. Upon arrival at Big Ed's, Maybin drank alcoholic beverages and played some pool with friends while defendant and Spruill went toward the dance floor. Witnesses at the bar saw defendant and Spruill walk in and out of the bar together numerous times that night, and they remembered a period in which the two were absent from the bar. One of the bartenders recalled defendant asking her to give him a discount on the purchase of a beer at about 7:00 p.m. because he only had five dollars.

Sometime between 8:00 and 9:00 p.m., Spruill approached Maybin in the bar and asked her if she wanted to go with Spruill and defendant "back to the crack man's house." Maybin said no, but defendant subsequently told her that she was going. On the way to Folly Road, Maybin inquired as to how defendant and Spruill intended to pay for the drugs since they were unemployed. Defendant told Maybin that he was "going to take it."

When the three reached the entrance to Freeman's Trailer Park, the defendant pushed Maybin's head down and told her to stay down because the "crack man" would not sell them drugs if he saw a stranger in the truck. A witness saw the truck approach the victim's trailer and subsequently identified Spruill as the driver of the truck. Maybin testified that the defendant and Spruill got out of the truck. She heard a metallic banging sound in the bed of the truck. Defendant and Spruill then walked toward the victim's trailer. Maybin put her head on the seat beside the steering wheel and cracked the driver's side window in preparation for smoking a cigarette.

Suddenly Maybin heard a noise that sounded like someone being thrown against a wall. Concerned that either defendant or Spruill might be hurt, she left the truck and walked toward the partially opened front door of the trailer. As she pushed the door open and stepped inside, Maybin saw the victim sitting on the floor, with defendant and Spruill standing before him. Blood covered the victim's face, neck and chest. Defendant and Spruill were in the process of handing a Baggie, the type commonly used to hold drugs, between the two of them when they noticed Maybin in the doorway. In that instant, the victim looked at Maybin and tried to lift his hands in a plea for help. Spruill held the victim down, and defendant cut his throat. Blood went everywhere as the victim writhed on the floor. Defendant told Maybin to remove the contents of the victim's pocket. As Spruill held the victim down, Maybin pulled a roll of money and a small Baggie out of the victim's pocket and placed it in defendant's pocket. When she leaned over to get the money, defendant told Maybin that she would meet the same fate if she ever told anyone what had happened.

The three then left the victim's trailer and went to defendant's residence, where defendant got a change of clothes. From there, they went to Spruill's house, where they changed their clothes, cleaned the truck and burned their bloody clothes in a wood heater. They then returned to Big Ed's Bar, entering separately so as not to appear as having been together. The bartender who had seen the three earlier that evening noticed upon their return that defendant was wearing different clothes and that Spruill's hair was wet, which it had not been earlier. Another individual present at the bar testified that defendant returned around 10:30 p.m. wearing different clothes. When the witness danced with defendant, she noticed a blood spot on the back of defendant's pants, which he attributed to a cut he sustained at his apartment. The bartender further testified that defendant and Spruill acted differently upon their return, with Spruill being fidgety and uptight, and defendant appearing high on drugs. Defendant, who had only five dollars earlier, purchased approximately eighteen bottles of beer soon after his return and paid for them with crumpled ten- and twenty-dollar bills he pulled from his pocket. Later, the bartender overheard defendant tell Spruill "he couldn't believe he got away with offing a nigger."

Shortly after 10:00 p.m., residents of the trailer park discovered the victim's lifeless body and called law enforcement authorities. State Bureau of Investigation (SBI) Special Agent Dennis Honeycutt,

the mobile crime lab operator for the Northeastern District of North Carolina, arrived at the scene at approximately 12:30 a.m. on the morning of 19 December 1993. Agent Honeycutt testified that he observed blood on the steps, porch and door on the exterior of the victim's trailer. The victim's body was just inside the front door, and there was a significant amount of blood beneath his head. The trailer was in a general state of disarray. There was blood on and around the couch, on the curtains behind the couch, on the front of the refrigerator and on the kitchen floor and cabinets. A tire iron wrapped in a plastic bag and covered with blood was located in the kitchen. Blood spatters on the refrigerator were consistent with blows struck with a tire iron. Fingerprint and blood samples were inconsistent with defendant's. A search of the victim's pockets revealed approximately $109.00 in his front pockets, but nothing in either rear pocket. No Velcro wallet was found at the scene.

An autopsy of the victim revealed that he had sustained numerous injuries before ultimately dying. The victim suffered a minimum of twelve blunt-impact wounds over the top of his head and over the front of his forehead. These blows were consistent with tire iron impacts. The victim also suffered multiple cutting and stabbing wounds. Of the ten cutting wounds, several were on the hands, indicating a struggle against a knife-wielding assailant. The victim sustained approximately fourteen stab wounds, including numerous wounds to the neck, the back of the head, the base of the skull, and the back and approximately six stab wounds to the chest. The cutting wounds were mainly in the neck area, with the fatal one crossing the victim's windpipe at the level of the voice box. This produced a gaping, open wound from side to side, cutting both of the jugular veins and the carotid artery on the left side. The autopsy report concluded that the stab wounds and blows to the head would have been painful as long as the victim was conscious, and that the victim was still alive when he suffered the stabbing and cutting wounds. The autopsy also revealed that after the victim's throat was cut, the victim could not have lived more than two minutes and likely would not have been conscious. The approximate time of the victim's death was between 8:30 and 9:30 p.m. on 18 December 1993.

Defendant was sought in connection with the killing. Witnesses informed law enforcement that defendant had fled to Tennessee, and on 7 December 1994, authorities were notified that defendant was at his parents' house in Milan, Tennessee. Defendant was located hiding underneath his parents' house when an officer moved a rug covering

a hole in the floor of a utility room. Defendant was arrested and waived extradition to North Carolina.

At trial, defendant presented evidence tending to show that the truck which defendant and his two accomplices were accused of driving on the night of the murder was not in proper working condition due to transmission problems, but was operational if transmission fluid was added, and that the truck had remained in its usual parking location that night. Defendant also presented testimony from friends present at Big Ed's Bar who stated that they did not see defendant leave the bar on the night of the murder.

The jury found defendant guilty of robbery with a dangerous weapon and guilty of first-degree murder. After a capital sentencing proceeding, the jury recommended a sentence of life imprisonment for the first-degree murder conviction, and the trial court sentenced defendant accordingly. The trial court then sentenced defendant to an additional forty years for the robbery conviction.

[1] In his first assignment of error, defendant contends the trial court erred by failing to intervene *ex mero motu* to prohibit the State from questioning prospective jurors during jury selection *voir dire* in a manner that misinformed jurors about applicable law and tended to "stake out" the verdict that jurors would render in the present case. The crux of defendant's argument on this issue is that the prosecutor's disputed *voir dire* questions misstated the law regarding the weight to be given interested witness testimony and, as a result, pledged jurors in advance to treat interested witness testimony as having the same weight as any other testimony presented. Defendant argues that by allowing this allegedly improper inquiry, the trial court violated defendant's constitutional and statutory rights to due process of law and to a fair and impartial jury. We hold this contention to be without merit.

A review of the record indicates that after preliminary questioning of the jury venire by the trial court, the prosecutor asked the following question of the panel:

> There may be a witness who will testify in this case pursuant to a plea arrangement, plea bargain, a "deal" if you will, with the State. The mere fact that there is some plea arrangement, some plea bargain, entered into [by] one of the codefendants, would that affect your decision or your verdict in this case, just the fact that there had been some plea arrangement with one of the witnesses?

After jurors responded that it would not, the prosecutor asked:

> To put it another way, could you listen to the court's instructions of how you are to view accomplice or interested witness testimony, whether it came from the State or the defendant; could you listen and follow the court's instructions as to how you were to view that testimony? Anyone that could not do that?

There were no affirmative responses from the jury venire, and the prosecutor further asked:

> After having listened to that testimony and the court's instructions as to what the law is, and you found that testimony believable, could you give it the same weight as you would any other uninterested witness? Anyone that could not do that?

Again, there were no affirmative responses. Subsequently, as additional jurors were called, the prosecutor asked virtually identical questions. Defendant never objected to this line of questioning throughout the jury selection *voir dire.*

In *State v. Vinson,* 287 N.C. 326, 215 S.E.2d 60 (1975), *death sentence vacated,* 428 U.S. 902, 49 L. Ed. 2d 1206 (1976), this Court set forth certain limits regarding the permissible inquiry of prospective jurors during *voir dire*:

> On the *voir dire* . . . of prospective jurors, hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed. Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts. In the first place, such questions are confusing to the average juror who at that stage of the trial has heard no evidence and has not been instructed on the applicable law. More importantly, such questions tend to "stake out" the juror and cause him to pledge himself to a future course of action. This the law neither contemplates nor permits. The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts.

*Id.* at 336, 215 S.E.2d at 68; *see also State v. Kandies,* 342 N.C. 419, 467 S.E.2d 67, *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 167 (1996); *State v. Lynch,* 340 N.C. 435, 459 S.E.2d 679 (1995), *cert. denied,* ——

STATE v. JONES

[347 N.C. 193 (1997)]

U.S. ——, 134 L. Ed. 2d 558 (1996); *State v. Robinson,* 339 N.C. 263, 451 S.E.2d 196 (1994), *cert. denied,* 515 U.S. 1135, 132 L. Ed. 2d 818 (1995); *State v. Parks,* 324 N.C. 420, 378 S.E.2d 785 (1989); *State v. Avery,* 315 N.C. 1, 337 S.E.2d 786 (1985). Hypothetical questions that seek to indoctrinate jurors regarding potential issues before the evidence has been introduced and before jurors have been instructed on applicable principles of law are similarly impermissible. *Parks,* 324 N.C. at 423, 378 S.E.2d at 787. These prohibitions are founded in the constitutional right of a criminal defendant to trial by an impartial jury. However, the right to an impartial jury contemplates that each side will be allowed to make inquiry into the ability of prospective jurors to follow the law. Questions designed to measure a prospective juror's ability to follow the law are proper within the context of jury selection *voir dire. State v. Price,* 326 N.C. 56, 66-67, 388 S.E.2d 84, 89, *sentence vacated on other grounds,* 498 U.S. 802, 112 L. Ed. 2d 7 (1990).

In reviewing any jury *voir dire* questions, this Court examines the entire record of the *voir dire,* rather than isolated questions. *Parks,* 324 N.C. at 423, 378 S.E.2d at 787. It is well established that the right of counsel to inquire into the fitness of prospective jurors is subject to close supervision by the trial court. *Avery,* 315 N.C. at 20, 337 S.E.2d at 796-97. The regulation of the manner and the extent of the inquiry rests largely in the discretion of the trial court. *Id.* at 20, 337 S.E.2d at 797. The exercise of such discretion constitutes reversible error only upon a showing by the defendant of harmful prejudice and clear abuse of discretion by the trial court. *Id.*

An examination of the disputed *voir dire* in this case indicates that the trial court did not abuse its discretion in allowing the prosecutor's questions regarding prospective jurors' abilities to follow the law with respect to interested witness testimony. The prosecutor's questions do not constitute inaccurate or inadequate statements of the law of interested witness testimony. When an accomplice is testifying on behalf of the State, the accomplice is considered an interested witness, and his testimony is subject to careful scrutiny. *State v. Stanfield,* 292 N.C. 357, 364-65, 233 S.E.2d 574, 580 (1977). The jury should analyze such testimony in light of the accomplice's interest in the outcome of the case at hand. *State v. Vick,* 287 N.C. 37, 43, 213 S.E.2d 335, 339, *cert. dismissed,* 423 U.S. 918, 46 L. Ed. 2d 367 (1975). After such scrutiny, if the jury believes the witness has told the truth, the jury "should give [the] testimony the same weight as it would give to any other credible witness." *Id.; accord State v. Larrimore,* 340

N.C. 119, 167, 456 S.E.2d 789, 815 (1995). The prosecutor's questions merely inquired into the ability of prospective jurors first to consider the testimony of an interested witness and the instructions of the trial court relative thereto, and then to give it the same weight as the testimony of any other witness if they found the testimony credible. This was proper inquiry, and the questions certainly were not of such a character that the trial court's decision not to intervene *ex mero motu* constitutes an abuse of discretion.

These questions clearly did not seek to predetermine what kind of verdict prospective jurors would render or how they would be inclined to vote. Rather, they were designed only to determine if prospective jurors could follow the law and serve as impartial and unbiased jurors. Thus, the questions were plainly within the bounds of permissible *voir dire* during jury selection.

In *State v. Burr*, 341 N.C. 263, 461 S.E.2d 602 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 526 (1996), this Court held as proper a question substantially more direct in relation to the verdict itself. There, the prosecutor inquired whether prospective jurors could "*focus* . . . on whether or not this defendant . . . is guilty or not guilty of killing the child [victim]," in spite of evidence that would be presented showing the child victim had been abused. *Id.* at 286, 461 S.E.2d at 614 (emphasis added). This Court determined that the question was not an improper stakeout of a prospective juror because: (1) the question did not incorrectly or inadequately state the law, (2) the question "was not an impermissible attempt to ascertain how this prospective juror would vote upon a given state of facts," and (3) the question permissibly sought to measure the ability of the prospective juror to be unbiased. *Id.* Precisely the same may be said of the prosecutor's questions in the case *sub judice*. This assignment of error is overruled.

[2] By his next assignment of error, defendant contends the trial court erred by admitting over defendant's objection a hearsay statement made by witness Deputy Sheriff Janice Spruill during the State's rebuttal case. During the presentation of his defense, defendant called as a witness Gail Champ, who testified that defendant had lived on the Champs' property and had taken a trip to Tennessee. During cross-examination, the State sought to establish that Champ had notified law enforcement authorities of defendant's flight to Tennessee, but she denied this and would not so testify. The State, in its rebuttal case, subsequently called Deputy Spruill to refute Champ's testimony. The following exchange occurred:

**STATE v. JONES**

[347 N.C. 193 (1997)]

Q. [Prosecutor] What did [Gail Champ] tell you at that time relative to the defendant in this case, Mr. Robert Solis [alias for Wallace Jones]?

A. [Deputy Spruill] She told me that [defendant] had been taken to Tennessee by Kevin Furlough in Ed Champ's little red car; that they had taken him to some part of Tennessee. She couldn't remember if it was Nashville or Memphis, Tennessee. And, that she didn't think it was right. She also told me that, on one occasion, she had been to [defendant's] trailer and that she had seen what appeared to be blood in the bathtub.

Defendant's subsequent objection and motion to strike were overruled. Defendant argues that all of the above testimony was hearsay, not within a recognized exception to the hearsay rule, and should have been excluded. Defendant further argues that the portion of the testimony regarding blood in defendant's bathtub was highly prejudicial, since the identity of the killer was central to the resolution of this case. Defendant asserts he is entitled to a new trial as a result of the admission of this testimony. We disagree.

When a prior inconsistent statement by a witness relates to material facts in the witness' testimony, the prior statement may be proved by extrinsic evidence. 1 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 161 (4th ed. 1993). Material facts are those involving matters pertinent and material to the pending inquiry. *Larrimore,* 340 N.C. at 146, 456 S.E.2d at 803. Evidence of a criminal defendant's flight following the commission of a crime is evidence of his guilt or consciousness of guilt. *State v. King,* 343 N.C. 29, 38, 468 S.E.2d 232, 238 (1996). In the present case, the testimony of Deputy Spruill regarding Champ's previous statements about defendant's flight were introduced by the State for the purpose of impeaching Champ's in-court testimony that contradicted her prior assertions. The in-court testimony went to a material issue, defendant's flight from authorities, and therefore his guilt. As such, the extrinsic evidence presented by Deputy Spruill was properly admitted by the trial court for impeachment purposes.

[3] Regarding the statement allegedly made to Deputy Spruill by Champ about blood in the defendant's bathtub, defendant has failed to establish sufficient prejudice to constitute grounds for a new trial. "A defendant is prejudiced . . . when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial . . . ." N.C.G.S. § 15A-1443(a)

**STATE v. JONES**

[347 N.C. 193 (1997)]

(1988). Deputy Spruill's unsolicited aside does not rise to this level and could not have tilted the scales against defendant in light of the State's evidence as a whole. Further, the record reveals that Deputy Spruill's comment was neither belabored nor expounded upon. The prosecutor immediately redirected Deputy Spruill to the prior line of questioning regarding defendant's flight, and the statement was in no way connected to the date or events surrounding the murder. In fact, all of the evidence establishes that defendant and his accomplices cleaned themselves and changed clothes at Leroy Spruill's residence, and that defendant only ran in his trailer for an instant to get a fresh set of clothes.

The primary account of the killing was given through Dana Maybin's testimony, and substantial other evidence corroborated her account of the murder. Maybin's description of the killing was corroborated by Agent Honeycutt's findings upon arrival at the scene of the crime. Maybin's testimony that Maybin, Leroy Spruill and defendant drove Spruill's father's truck was corroborated by a witness who saw Spruill driving his father's truck near the victim's residence. Maybin's testimony that she heard a sound like someone being thrown against a wall was corroborated by findings of a blood smear on the wall of the trailer. Maybin's description of the method of killing was entirely consistent with the autopsy report. Testimony that the three had changed clothes was corroborated by witnesses who noticed that defendant was wearing different clothes upon returning to Big Ed's Bar. Finally, testimony that money was taken was corroborated by witnesses who noted that defendant had no money early that evening but purchased large amounts of alcohol with crumpled ten- and twenty-dollar bills later that evening. In light of the extensive evidence of defendant's guilt, the trial court's allowance of Deputy Spruill's unsolicited and brief comment cannot be said to constitute prejudicial error. This assignment of error is overruled.

Defendant in his next assignment of error asserts the trial court engaged in improper and disrespectful conduct toward defendant's counsel by making insulting and sarcastic comments both in and out of the presence of the jury. Defendant maintains that the trial court's comments violated N.C.G.S. § 15A-1222; N.C.G.S. § 15A-1232; established rules of professional conduct; and defendant's rights to due process of law and effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution. We find defendant's contentions to be without merit.

N.C.G.S. § 15A-1222 prohibits the trial court from expressing an opinion in the presence of the jury on any question of fact to be decided by the jury. N.C.G.S. § 15A-1222 (1988). "In evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized." *Larrimore*, 340 N.C. at 155, 456 S.E.2d at 808. "The trial court has a duty to control the examination of witnesses, both for the purpose of conserving the trial court's time and for the purpose of protecting the witness from prolonged, needless, or abusive examination." *State v. White*, 340 N.C. 264, 299, 457 S.E.2d 841, 861, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 436 (1995). In performing this duty, however, the trial court's position as the "standard-bearer of impartiality" requires that "the trial judge must not express any opinion as to the weight to be given to or credibility of any competent evidence presented before the jury." *Larrimore*, 340 N.C. at 154-55, 456 S.E.2d at 808. An examination of the comments about which defendant complains reveals that the trial court did not express impermissible opinions about the value of defendant's evidence or the ability of defendant's trial counsel.

[4] The first statement that defendant points to in support of his argument occurred during defendant's cross-examination of State's witness James "Duke" Carter. Counsel inquired about a fact attributed to Carter in some notes taken by law enforcement authorities during a meeting between Carter and those authorities. Carter denied making the statement, whereupon defense counsel stated, "Well, this statement that the district attorney has handed me says, 'Carter states that he then got up and went over to Frank's house at about 7:30 a.m.'" The trial court interrupted, and the following exchange occurred:

> THE COURT: If you're going to examine him about that statement which he says he did not prepare, you're going to have to let him read it and see whether or not that's his statement. He's not responsible for what someone else wrote on a piece of paper unless he has the opportunity to examine it.

> MR. VOSBURGH [defense counsel]: May I approach the witness and let him examine them?

> THE COURT: Yes.

> MR. VOSBURGH: May I ask him, if he would, while we're at it, review both of these statements?

> THE COURT: Yes, sir.

**STATE v. JONES**

[347 N.C. 193 (1997)]

Q. [Vosburgh] Let me ask you to review those statements, and; after you do, I'll ask you some more questions.

(Witness complies.)

Q. Have you read all the way through those statements?

A. I read right here where it's statin' that—

THE COURT: Answer what he asked. Have you read each of those pages?

A. No, sir, not all of them.

THE COURT: Read the whole thing, because I'm sure he's going to ask you lots of questions on what's in those papers.

Defendant's contention that this exchange expressed to the jury the trial court's opinion that defendant's counsel was going to waste time by his forthcoming questions is misplaced. The trial court's comments were appropriate and legally proper. The statement counsel was reading from was not prepared by the witness, and he was not responsible for it absent a thorough examination. The trial court's directing that the witness read the entire statement in preparation for upcoming questions was nothing more than a proper admonition to the witness to answer the question he was asked and do what was requested. There is no reasonable possibility that the jury could have construed this statement in the manner suggested by defendant.

[5] The next statement about which defendant complains occurred during the State's direct examination of Carter. During examination by the State, the following occurred:

Q. [Prosecutor] Now, also in your statement, who were the white people that he would deal with, that he would sell to?

A. Well, I've seen Steve Jones; his wife—

MR. VOSBURGH: Excuse me. What was the second one?

A. His wife.

MR. VOSBURGH: Whose wife?

A. Steve's wife.

THE COURT: Mr. Vosburgh, you don't ask the witness questions when he's being examined by the State.

MR. VOSBURGH: I'm just trying to get him to speak up, Judge.

STATE v. JONES

[347 N.C. 193 (1997)]

THE COURT: Well, you'll have a chance to ask him about that. I don't see any relevance to this, and I think you need to move along. Go ahead and ask him a question.

These comments were well within the proper bounds of the trial court's duty to control the examination of witnesses and were not demeaning to defendant's counsel as defendant contends. The trial court merely instructed defendant's counsel to wait his turn for questioning. The comments regarding relevance and "to move along" clearly were directed not at defendant's counsel, but rather at the prosecutor. Thus, they reflected on the value of the State's case, if anything.

[6] The defendant's next complaint centers on comments made during an objection by defendant's counsel. The allegedly demeaning remarks occurred during the following exchange:

Q. [Prosecutor] Mr. Swain [the victim's cousin], if you would, please, if you would point out to us on the diagram how you get into the place where you live off of Folly Road and U.S. 64.

MR. VOSBURGH: Your Honor, I object to the district attorney at what he's asking the witness to do.

THE COURT: That objection is sustained. You don't have to make speeches, Mr. Vosburgh. Just file your objections.

This comment by the trial court regarding the making of speeches, while unnecessary and inappropriate in this context, cannot reasonably be interpreted as demeaning or belittling counsel before the jury. The trial court sustained defense counsel's objection, thus arguably bolstering his reputation, to the extent such rulings have any effect on the jury. The record reflects that the trial court repeatedly ruled on objections in a crisp manner and prevented both parties from presenting duplicative or unnecessary evidence or comment. This isolated comment is not sufficiently different or weighty to constitute error, either in isolation or in conjunction with defendant's other assertedly erroneous comments.

[7] The defendant's next complaint arises from the following colloquy that occurred during defendant's cross-examination of State's witness SBI Agent Honeycutt:

Q. [Defense counsel] Beyond that list, if you found the right person, you'd be able to make a match.

A. If not those of Mr. Swain [the victim], yes, sir.

Mr. Skinner [Defense counsel]: Thank you.

The Court: Anything further, Mr. Norton [prosecutor]?

Mr. Vosburgh: Your Honor, we hadn't finished—

The Court: Well, he thanked him. You don't need to thank a witness for his answer. I'll let him ask some more questions; but, do not thank a witness for his answers. Ask the next questions, and let's move along.

The trial court's comments cannot reasonably be construed as anything more than an effort to move the proceedings along. Throughout the trial, the trial court required both parties to meet certain standards aimed at achieving an efficient and focused hearing. Thus, in the overall context, this comment cannot be considered erroneous.

[8] Next, defendant complains of the following exchange involving defense counsel's questioning of Timothy Swain, the victim's cousin:

Q. [Mr. Vosburgh] How long after this incident took place was it that you moved with your grandmother and, I believe, your wife?

The Court: He's been asked and answered that once, Mr. Vosburgh.

Mr. Vosburgh: Well, I don't recall his answer.

A. Five months ago.

Q. Five months ago?

A. About five months ago, right.

As the preceding can only be interpreted as an effort by the trial court to prohibit repetitive questioning, and as defendant received the answer he wanted, this exchange clearly does not constitute error.

[9] Finally, defendant contends the trial court expressed improper opinions during two instances in which the trial court prohibited repetitive questioning. In the first, defense counsel asked SBI Agent Honeycutt to "repeat that answer." The trial court interjected, "Why do you want him to repeat it?" and, turning to the jury, asked, "Did the jury hear the answer?" When the jury responded that it had heard the answer, the trial court instructed defendant's counsel to "ask the next question." In the second instance, the following occurred:

Q. [Mr. Skinner, defense counsel] When you observed that tire iron and bag over there, did you notice any fluids under it?

A. [Dr. Harris, pathologist] I didn't pick it up. I don't know.

Q. You didn't notice any fluid under this—?

A. No; I didn't look. I don't move those things.

Q. You didn't walk over and look real closely—?

A. Well, I walked over and looked; but, I didn't move anything.

THE COURT: He said he didn't observe anything, Mr. Skinner. How many times does he have to say it?

In both of the foregoing instances, the trial court was attempting to prevent repetitive questioning, and the remarks at issue explain why the questioning was disallowed. These comments cannot be said to be erroneous, especially in light of the numerous similar remarks made to the State's counsel.

Assuming *arguendo* that any of the above comments by the trial court could be construed to constitute the expression of an opinion, every such impropriety by the trial court does not result in prejudicial error. *State v. Blackstock*, 314 N.C. 232, 236, 333 S.E.2d 245, 248 (1985). Whether a trial court's comments, questions or actions constitute reversible error is a question to be considered in light of the factors and circumstances disclosed by the record, and the burden of showing prejudice is upon the defendant. *Id.* Defendant has failed to show such prejudice in this case. A review of the record shows that the trial court was equally stern and equally permissive to both parties in a consistent manner for the purpose of conducting a fair, efficient and controlled trial. Defendant has pointed to no statement by the trial court which, taken either in isolation or together with all other allegedly improper statements, can be said to constitute a prejudicial expression of opinion on an issue of fact or an intimation of a position deleterious to defendant's case. Thus, this assignment of error is overruled.

[10] Defendant next assigns error to the trial court's allowance of certain testimony by accomplice Dana Maybin. Maybin testified that she kept a diary while incarcerated in Beaufort County after her December 1994 arrest. The majority of the testimony regarding the diary related to Maybin's reasons for recanting in her diary her earlier implication of defendant in the victim's murder. The testimony was

received into evidence largely without objection from defendant. However, Maybin was allowed to testify over objection about a dream she had on 16 December 1994, immediately after her arrest. After identifying a portion of her diary, the following exchange occurred between the prosecutor and Maybin:

Q.  What part of the diary is it that you have there?

A.  It's mostly about the bad dreams that I'd been having.

Q.  What kind of dreams were you having when you were first brought to the Beaufort County Jail?

MR. VOSBURGH:  Objection.

THE COURT:  Overruled.

A.  I dreamed this Indian man got his throat cut, and he fell in my arms. I dreamed—

Q.  What day was it that you had that dream?

A.  December the 16th.

Q.  How many days had you been in jail at that time?

A.  One.

The prosecutor then attempted to question Maybin about whether she had a dream on 17 December. The trial court excused the jury in order for the prosecutor to explain the relevance of the testimony. Out of the presence of the jury, the prosecutor stated:

This case is going to depend, in large part, on Ms. Maybin's credibility, and the State needs to be in the position to explain why these various items were, various letters and various diary entries, were being written.

The trial court sustained defense counsel's objection and prohibited any further questions regarding the bad dreams. Defendant argues that the 16 December dream testimony that was allowed in the jury's presence was irrelevant pursuant to Rule 401 of the Rules of Evidence and, even assuming it was relevant, that it was unduly prejudicial and should have been excluded under Rule 403.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). " 'In criminal

cases, every circumstance that is calculated to throw any light upon the supposed crime is admissible,' and '[t]estimony is relevant if it reasonably tends to establish the probability or improbability of a fact in issue.' " *State v. Pridgen*, 313 N.C. 80, 88, 326 S.E.2d 618, 623 (1985) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 78 (2d ed. 1982)). Furthermore, the evidence need not bear directly on the issue of guilt or innocence. Evidence is competent and relevant if it nevertheless shows a circumstance from which the jury may infer a fact in issue. *Id.*

The testimony regarding the dream of 16 December clearly was relevant. It went to establish the emotional state underlying this witness' reason for her subsequent diary recantations—the fear caused by what she had done and of the Champ family, who had threatened her life if she testified against defendant. The issue then turns on whether the trial court should have excluded the testimony pursuant to Rule 403 on grounds of "unfair prejudice, confusion of the issues, or misleading the jury." N.C.G.S. § 8C-1, Rule 403 (1992). "However, to be excluded under Rule 403, the probative value of the evidence must not only be outweighed by the danger of unfair prejudice, it must be *substantially* outweighed." *State v. Lyons*, 340 N.C. 646, 669, 459 S.E.2d 770, 783 (1995). Whether to exclude evidence pursuant to Rule 403 is a matter left to the sound discretion of the trial court. *State v. Coffey*, 326 N.C. 268, 281, 389 S.E.2d 48, 56 (1990). A ruling by the trial court will be reversed for an abuse of discretion only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Hayes*, 314 N.C. 460, 471, 334 S.E.2d 741, 747 (1985).

Defendant has not shown such an abuse of discretion. The trial court admitted the relevant testimony from one day's diary entry but then excluded further repetitive references to the bad dreams. Furthermore, the testimony regarding the bad dreams was only one reason given by Maybin for her diary recantations about defendant's role in the murder. Considering all of the other evidence presented through Maybin's implicating defendant in the murder, there is no reasonable possibility that this one reference to a dream, within the context of explaining her motives for recanting, could have been so substantially prejudicial that the trial court's admission of the testimony constitutes an abuse of discretion. This assignment of error is overruled.

In his next assignment of error, defendant maintains the trial court erred by allowing the State to ask a question that assumed facts

STATE v. JONES

[347 N.C. 193 (1997)]

not in evidence. Defendant called as a witness Jack Spruill, the owner of the truck that was allegedly used by defendant and his two accomplices to travel to and from the crime scene. Jack Spruill testified that the truck was not used by Leroy Spruill on the day of the murder, and that the truck had transmission problems and was in a mechanical state inconsistent with driving more than short distances. On cross-examination, the following exchange occurred:

Q. You've kept up with the case, haven't you?

A. Well, since [Leroy Spruill] was charged, I've tried to.

Q. You've seen the copies of the statements that Leroy had given to the officers, haven't you?

A. No, sir.

Q. You've never looked at the statements, specifically, the December 24th, 1993, statement that your son gave about this truck?

MR. VOSBURGH: Objection.

THE COURT: Overruled. He asked whether or not he's looked at it.

A. No, sir. Nobody's come to me other than—Ms. Janice has come about wanting to bring the truck for investigation of it, yeah.

Q. But, you're not aware, even in talking with your son or in looking over the reports —

A. I haven't seen any reports.

Q. —that your son made a statement about this truck, about driving this truck that day?

THE COURT: Well, the objection is sustained as to what his son might have said.

Defendant asserts that this questioning was improper because it assumed facts not in evidence and amounted to testimony by the prosecutor. We disagree.

[11] Defendant has failed to preserve this issue for appeal. The potentially prejudicial statement from defendant's standpoint in the above exchange was the question, "But, you're not aware . . . that your son made a statement about this truck, about driving this truck

that day?" To this question, the trial court sustained objection and excluded as hearsay any further questions regarding what Leroy Spruill might have said. Defendant did not, however, ask that the statement be stricken. Where a trial court sustains a defendant's objection, and the defendant fails to move to strike the objectionable testimony, he waives his right to assert on appeal error arising from the objectionable testimony. *State v. Barton,* 335 N.C. 696, 709-10, 441 S.E.2d 295, 302 (1994). Thus, in light of the facts that defendant's objection was sustained and that no motion to strike was proffered, defendant has failed to preserve this issue for review. This assignment of error is overruled.

[12] Defendant's final assignment of error involves testimony by Maybin regarding out-of-court statements by Nichole Mills, one of Maybin's cellmates at the Beaufort County Jail. Maybin testified that it was on the advice of Mills that she began writing in her diary that she had lied about defendant's involvement in the murder. Mills was never called as a witness. However, the State introduced through Maybin evidence of writing and statements allegedly made by Mills. Defendant's complaints are directed at three particular statements.

The first statement about which defendant complains involves Maybin's familiarity with defendant's counsel, Mr. Vosburgh. During direct examination, Maybin was asked if she had talked with any other attorney besides her own. Maybin responded that she talked with Maynard Harrell and Mr. Vosburgh in early March 1995. When asked whether she was familiar with the two attorneys prior to the March 1995 meeting, Maybin testified over objection that "Nichole [Mills] had said she had been talkin' to Vosburgh." The trial court sustained objections to subsequent attempted questions regarding what Mills might have told Maybin about Mr. Vosburgh.

The second statement to which defendant assigns error relates to a portion of the diary read into evidence by Maybin. Maybin was asked to read from a diary entry dated 24 March 1995, and she read the following:

I got a letter from Nichole today. She said the rumor is that I've been telling people that Vosburgh is the one who has been telling me to say everything I've said. That's a lie because I was only telling him the truth.

Defendant did not object to this testimony.

STATE v. JONES

[347 N.C. 193 (1997)]

The third piece of evidence to which defendant assigns error is the introduction through Maybin of a portion of the actual letter written by Mills to Maybin. The substance of the letter read in relevant part:

> because my concern is not losing contact with you. Vosburgh will also know where I am. He wanted to come see you today or tomorrow; but, Regina [Maybin's counsel] said no. Why? She told Vosburgh that you would burn him; that you had been telling people Vosburgh "told me this. He told me to do and say this." I don't believe it for a moment; but, just to be sure, you watch what you say. Mr. Vosburgh is up in Raleigh for three days, until Saturday. He maybe will get to see you the next time.

Defendant contends the statements, if believed for the truth of the matters asserted, tend to show Mills was visiting with Mr. Vosburgh and then telling Maybin what to write in her diary. This, defendant claims, was highly prejudicial to his case because it led the jury to believe defendant's counsel was manipulating the evidence. Defendant argues that the testimony was impermissible hearsay, irrelevant and unduly prejudicial and that it should have been excluded by the trial court. We find defendant's contentions to be without merit.

Hearsay is defined as an out-of-court declaration offered for the purpose of proving the truth of the information contained in the declaration. N.C.G.S. § 8C-1, Rule 801(c) (1992). When a declaration is offered for a purpose other than to prove the truth of the matter asserted, the evidence is not hearsay. *State v. Reid*, 335 N.C. 647, 661, 440 S.E.2d 776, 784 (1994). When offered to explain the subsequent conduct of the person to whom the declaration was made, an out-of-court declaration is not considered hearsay. *Id.*

An examination of the above statements, in light of Maybin's entire testimony, reveals that the statements were not hearsay. In April 1994, Maybin told police officers that defendant confided to her he had killed the victim by cutting his throat, but she did not then reveal her presence at the crime scene. Subsequently, Maybin sent a letter to the Washington County Sheriff's Department in May 1994 renouncing her previous statement and saying she had no knowledge of the murders. In June 1994, the next time she talked with law enforcement, Maybin changed her story again and confessed that she was present at the crime scene and saw defendant kill the victim. Maybin was arrested and placed in custody in the Beaufort County Jail, where one of her cellmates was Nichole Mills. She began

keeping a diary shortly thereafter in which she wrote numerous recantations.

The prosecutor sought to have Maybin explain why she claimed she knew nothing of the murders and why she changed her story so many times. Maybin testified that she wrote the first letter because she "wanted [the case] to go away." She testified she did this for several reasons: (1) she had been having nightmares; (2) defendant had threatened her if she turned him in; (3) she was intimidated by the Champ family, who were friends with defendant; and (4) she did not want to ruin a good relationship she had formed with a gentleman in South Carolina. Maybin further testified that Mills told her to write the diary recantations because it would result in her being "declared an incompetent witness." Another reason, Maybin testified, was that she had spoken with defendant's attorneys and other individuals who told her that the only evidence the State possessed was her testimony.

Viewed within this context, it is clear the statements to which defendant assigns error are not hearsay. The evidence was not admitted to prove the truth of any matter asserted within the statements, but rather to explain why Maybin recanted her earlier statements implicating defendant, and later herself, in the murder of Frank Swain.

Because the statements went to show the reasons for Maybin's recantations, the statements were relevant and well within the broad bounds of N.C.G.S. § 8C-1, Rule 401. Furthermore, the statements were not so unfairly prejudicial, pursuant to N.C.G.S. § 8C-1, Rule 403, as to cause the trial court's admission of them to constitute an abuse of discretion. Regarding the first statement, defendant claims it prejudiced him by intimating to the jury that his counsel had committed wrongdoing by telling Maybin she could weaken the State's case by writing recantations in her diary. No such inference could be reasonably drawn from this statement. The mere fact that Maybin was familiar with Mr. Vosburgh due to her cellmate's discussions cannot reasonably be said to have conveyed the thought to the jury either that Mr. Vosburgh was acting improperly or that any action taken by Maybin was a result of talking with Mr. Vosburgh. It was clear from other evidence that defense counsel interviewed Maybin and others in their investigation of the case. Thus, the trial court did not err by admitting this statement.

Regarding the second and third statements, defendant did not object to this testimony, and he has waived his right to assert error

on appeal arising out of the admission of the evidence. N.C.G.S. § 15A-1446(b) (1988). Defendant is thus precluded from raising this issue on appeal unless plain error occurred. Defendant has failed to establish such error. What defendant's attorneys said to Maybin during their meetings was the subject of extensive inquiry on direct examination. This testimony revealed that defense counsel interviewed Maybin, and many others, in an effort to establish the truth about their client's case. There is little reason to conclude that the statements regarding rumors of what Maybin was telling people could have led the jury to believe defendant's counsel was acting improperly or, in light of the substantial evidence presented of defendant's guilt, that these statements resulted in the jury's reaching a different result at trial. This assignment of error is overruled.

For the foregoing reasons, we conclude that the defendant received a fair trial, free of prejudicial error.

NO ERROR.