LEVINSON, Judge.
Defendant (Jerry Julian Hines) appeals from conviction and judgment for first-degree murder. For the reasons that follow, we hold that defendant received a fair trial, free of prejudicial error.
The State's evidence presented at trial tended to show the following: Between 6:15 and 6:18 a.m. on 12 February 1999, Lester Eugene Lord was shot and killed outside of his apartment just prior to entering his automobile. An autopsy revealed that Lord's death was caused by a shotgun wound to the left arm and chest. Prior to his death, Lord was involved in a romantic relationship withdefendant's estranged wife, Sheila Montgomery. Montgomery and defendant were separated and both were seeing other people.
Defendant was bothered by the relationship between Lord and Montgomery and by Lord's interaction with defendant's children. Montgomery testified that, when she rebuffed defendant's requests to resume their relationship, defendant told her, "[I]f you don't do something, you know, to get him [Lord] out of your life, I'm going to end up killing this man. I cannot go on. . . . If you don't do something about it, I'm going to kill you, him, and myself. . . . I cannot take it anymore." Defendant also expressed concerns as to whether his children were being spanked by Lord and whether Lord was treating them well. Defendant's son testified that defendant told him that "something was going to happen real soon" and stated "I'm going to kill Lester [Lord]." Defendant's former girlfriend, Bonnie Page, testified that she and defendant dated in 1997 and 1998 and that, during their relationship, defendant asked her questions about crime scene investigations and, more specifically, gunshot residue based on knowledge she obtained from her employment as a legal assistant and investigator. Page further testified that, on more than one occasion, defendant stated, "I'm going to kill [Lord] and they will just have to prove it."
On the morning of Lord's shooting, defendant's probation officer, Benjamin Lynch, was driving a school bus. At 6:28 a.m. the bus was stopped at an intersection located on the most direct route between defendant's house and Lord's apartment. At thattime, Lynch noticed a vehicle which he recognized as one that defendant sometimes drove. The vehicle was traveling away from the direction of the crime and towards the direction of defendant's home. Lynch was unable to see who was driving the vehicle. An agent with the State Bureau of Investigation testified that, on a morning subsequent to the murder, he had driven the route between Lord's apartment and defendant's home "maintaining proper speed and the speed limit." According to the agent, he left Lord's apartment at 6:18 a.m., and it took him ten minutes to arrive at the intersection where Lynch had noticed the vehicle associated with defendant.
On 13 February 1999, investigators found a single shotgun with a red butt beneath a bridge which was located along the most direct route between the crime scene and defendant's house. The gun was laying in the water near the banks of the Broad River. An SBI agent testified that, although the Broad River is "at times a very silty river," the firearm "had virtually no siltation, just the slightest dusting on it." Examination of the gun revealed that it had not been under water for an extended period of time. There was evidence that the gun had been fired. No fingerprints were found on the gun; however, testing of the gun revealed that it may have produced the fatal wounding of the victim. Jerry Thompson, a witness for the State, testified that he bought and sold guns and that, in the fall preceding Lord's murder, he sold defendant a single-shot shotgun with a red butt. Thomson further testified that the gun retrieved by investigators "looked a lot like" the gunhe sold to defendant, though he could not be certain because "[t]here may be another one just like it." On cross examination, Thompson stated that he had never seen another shotgun with a red butt exactly like the one he sold to defendant.
A search of defendant's house revealed that, on the morning of Lord's murder, defendant's alarm clock was set for 5:20 a.m. Defendant's employer testified that he picked defendant up for work at approximately 7:30 a.m. that morning and that, approximately two hours later, defendant called his girlfriend and asked her to wash his jumpsuit.
Defendant presented the testimony of his cousin, Joe Staley, who stated that he had driven past defendant's house on the morning of the murder and had seen defendant's girlfriend's car parked in the carport at 6:24 that morning. Defendant also presented the testimony of his nephew, Charlie Miller, who indicated that he was at defendant's house on the morning of the murder and had observed that defendant was just awakening at 6:15 a.m.
Upon proper indictment, a Rutherford County jury convicted defendant of first degree murder, and the trial court imposed a sentence of life imprisonment without parole. From this conviction and judgment, defendant now appeals.
In his first argument on appeal, defendant contends that the trial court erred in denying his motion to dismiss the charge of first-degree murder based on insufficiency of the evidence. Defendant concedes that the evidence was sufficient to support afinding that Lord was murdered, but insists that the State's evidence was insufficient to permit a jury to find that defendant was the killer. We disagree.
A motion to dismiss should be denied where "there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." State v. Crawford, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996) (citation omitted). "Evidence is substantial if it is relevant and adequate to convince a reasonable mind to accept a conclusion." State v. Robinson, 355 N.C. 320, 336, 561 S.E.2d 245, 255-56, cert. denied, 537 U.S. 1006, 154 L. Ed. 2d 404 (2002) (citation omitted). "In considering a motion to dismiss, the trial court must analyze the evidence in the light most favorable to the State and give the State the benefit of every reasonable inference from the evidence." Id. (citation omitted). "The trial court must also resolve any contradictions in the evidence in the State's favor." Id. (citation omitted). "The trial court does not weigh the evidence, consider evidence unfavorable to the State, or determine any witness' credibility." Id. (citation omitted). "[T]he rule for determining the sufficiency of evidence is the same whether the evidence is completely circumstantial, completely direct, or both." State v. Wright, 302 N.C. 122, 126, 273 S.E.2d 699, 703 (1981) (citation omitted).
Defendant insists that the holding in State v. Chapman, 293 N.C. 585, 238 S.E.2d 784 (1977), compels a conclusion that there is insufficient evidence that he was the perpetrator. In thatfelonious assault case, the victim was shot in the back by a shotgun as he prepared to leave his home. "The victim did not see who shot him or where the blast came from. . . . Three weeks prior to the shooting, the victim had been acquitted of a robbery charge brought against him by defendant. Although defendant had refused to talk to the victim after the acquittal, there had been no harsh words between them concerning the charge." Id. at 586, 238 S.E.2d at 784. Defendant voluntarily gave his 12-gauge shotgun to the police, stating he had not fired it in two months. At the time it was surrendered, however, the gun contained a spent shell similar to one discovered near the place of the assault and later determined to have been fired from the defendant's gun. The breech of the gun carried a strong odor of gunpowder. Defendant gave an exculpatory statement that he had been watching television when he was told there had been a shooting. Defendant's evidence tended to show that he was seen by a passing motorist near where the crime occurred. At that time he had nothing in his hands, nor did the motorist see a gun nearby. Shortly after the motorist passed defendant, he heard a gunshot and reported it to the police. The motorist returned to the scene a few minutes later and observed the defendant wearing the same clothing as before. On these facts, our Supreme Court held that the evidence was insufficient to do more than raise a suspicion that the defendant secretly assaulted the victim:
The most the State has shown is that the victim could have been shot by a shell fired from defendant's gun. There is nothing, other than an inference which could arise from mereownership of the gun, that would tend to prove that defendant actually fired the shot. Beyond that we must sail in a sea of conjecture and surmise. This we are not permitted to do. Even when the State's evidence is enough to raise a strong suspicion, if it is insufficient to remove the case from the realm of conjecture, nonsuit must be allowed.
Chapman, 293 N.C. at 587-88, 238 S.E.2d at 786 (citations and internal quotation marks omitted).
The present defendant's reliance on Chapman is misplaced, as the evidence in the instant case is far more substantial. The present defendant told a number of people of his intentions to kill Lord. His alarm clock was set to sound at a very early hour on the morning of the killing. A person familiar with defendant spotted a vehicle that defendant sometimes drove traveling the most direct route between the crime scene and defendant's home approximately ten minutes after the murder; investigators determined that it takes approximately ten minutes to travel from the crime scene to the intersection where the vehicle was spotted. After defendant reported to work on the morning of the crime, he called his girlfriend on his employer's cellular telephone and told her to wash a single item of clothing, a jump suit. A shotgun, which investigators determined could have been used to perpetrate the murder, was found in the shallow water beneath a bridge on the most direct path between the crime scene and defendant's house. The shotgun, which had been fired recently, had a distinguishing feature: a red butt. A gun trader had sold the exact same type of shotgun with a red butt to defendant prior to the murder; the guntrader had never seen another gun with the red butt like the one he sold to defendant. This evidence, cast in the light most favorable to the State, permits an inference that defendant was the perpetrator of the victim's murder. As such, the trial court properly denied defendant's motion to dismiss. This assignment of error is overruled.
Defendant next contends that the trial court erred by permitting some of the witnesses at trial to testify that defendant had previously been arrested and was on probation. We do not agree.
Defendant takes issue with testimony offered by three different witnesses. First, defendant argues that the trial court committed plain error by permitting police officer Marc Daigle to testify that he had previously arrested defendant. Officer Daigle provided evidence for the State concerning the investigation of Lord's murder. During cross-examination, defense counsel asked Officer Daigle, "When did you meet [defendant]?" Officer Daigle answered, "I met defendant the night that I arrested him, before this." Defendant did not object to this answer or move that it be stricken, and now argues that the trial court committed plain error by allowing the testimony. However, we conclude that any error in permitting this testimony was not "so fundamental that, absent the error, the jury probably would have reached a different result." State v. Jones, 355 N.C. 117, 125, 558 S.E.2d 97, 103 (2002). Assuch, the trial court did not commit plain error by allowing the challenged testimony. Id.
Second, defendant argues that the trial court committed plain error by permitting defendant's estranged wife, Sheila Montgomery, to testify that defendant was a probationer. Montgomery provided evidence that defendant was angry because of her relationship with Lord and her refusal to reconcile with defendant. During the course of her testimony, Montgomery stated that defendant had to bring their children home at a certain time because he was on probation and that, to get defendant to leave her yard on one occasion when he was verbally accosting the victim, she threatened to call defendant's probation officer. Defendant did not object to this testimony by Montgomery, and now argues that the trial court committed plain error by allowing the testimony. However, we conclude that any error in permitting this testimony was not "so fundamental that, absent the error, the jury probably would have reached a different result." Id. As such, the trial court did not commit plain error by allowing the challenged testimony. Id.
Finally, defendant contends that the trial court erred in permitting defendant's probation officer, Benjamin Lynch, to testify concerning defendant's probationer status and to mention that Sheila Montgomery was the victim in defendant's probation case. Lynch testified that, while he was driving a school bus, he was able to recognize a vehicle he saw on the morning of the murder as being one defendant had driven before because defendant was "one of the people [Lynch] was charged with doing surveillance on." Over defendant's objection, the trial court permitted Lynch to state that "defendant attended two treatment programs. . . . And while he was there, I noticed the vehicle associated with him driving. Also, I've seen the vehicle in his driveway." Lynch testified that, after he learned about the murder, he informed investigators about his spotting of the vehicle because defendant's wife "was the victim in [defendant's] probation case." Defendant objected to this statement, to which the trial court replied, "I didn't hear what he said." Testimony then resumed without defendant procuring a ruling on his objection or making a motion to strike. At no time did Lynch testify as to the criminal transaction or conviction for which defendant was sentenced to probation. Defendant insists that any evidence that he was a probationer under Lynch's surveillance and any evidence that Lynch became familiar with the vehicle in the case during defendant's completion of probation requirements should have been excluded pursuant to N.C.G.S. § 8C-1, Rules 403 and 404.
Unless otherwise provided for, "[a]ll relevant evidence is admissible." N.C.G.S. § 8C-1, Rule 402 (2003). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id., Rule 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Id., Rule 403. Evidence of a person's character is not admissible for the purpose of proving that heacted in conformity therewith on a particular occasion, and evidence of other crimes is not admissible to prove a person's character in order to show that he acted in conformity therewith. Id., Rule 404(a),(b).
In the instant case, Lynch testified that approximately ten minutes after the murder he saw a car, which he had seen defendant drive before, traveling from the direction of the crime scene and in the direction of defendant's home. This testimony was not offered to prove that defendant committed the killing in conformity with poor character as evidenced by his being sentenced to probation for a criminal offense, but was instead offered to identify defendant as the driver of a vehicle seen driving between the site of the murder and defendant's house. If found credible, Lynch's level of familiarity with the vehicle and defendant's use of it makes it more probable that defendant was the driver of the vehicle on the morning of the killing, which makes it more likely that defendant was the perpetrator of the murder. Accordingly, this evidence was highly relevant under Rule 401 and admissible under Rule 402, and Rule 403 did not require its exclusion. As such, the trial court did not err in allowing this testimony.
Defendant also insists that the trial court erred by allowing Lynch to mention that Montgomery was the victim in defendant's probation case. Defendant did not obtain a ruling on his objection to this testimony and argues that permitting this testimony was plain error to the extent not fully preserved. Especially given the fact that the prosecutor did not pursue the matter further, weconclude that any error in permitting this testimony was not "so fundamental that, absent the error, the jury probably would have reached a different result." State v. Jones, 355 N.C. 117, 125, 558 S.E.2d 97, 103 (2002). As such, the trial court did not commit plain error by allowing the challenged testimony. Id. This assignment of error is overruled.
Defendant also argues on appeal that he is entitled to a new trial because the prosecutor engaged in prosecutorial misconduct. In his brief, defendant asserts three instances of alleged misconduct.
First, defendant argues that the prosecutor impermissibly asked a juror if she could find guilt beyond a reasonable doubt in the absence of an eyewitness to the murder. Defendant asserts that, in so doing, the prosecutor impermissible "staked out" the jury.
"The trial court has a great deal of discretion in monitoring the propriety of questions asked by counsel during voir dire, and the standard of review . . . is whether the trial court abused its discretion and whether that abuse resulted in harmful prejudice to defendant." State v. Henderson, 155 N.C. App. 719, 725-26, 574 S.E.2d 700, 705, disc. review denied, appeal dismissed, 357 N.C. 64, 579 S.E.2d 569 (2003). The trial court "`should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts.'" Id. (quoting State v. Vinson, 287 N.C.326, 336, 215 S.E.2d 60, 68 (1975), vacated in part, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976)). However, "[q]uestions designed to measure a prospective juror's ability to follow the law are proper within the context of jury selection voir dire." State v. Jones, 347 N.C. 193, 203, 491 S.E.2d 641, 647 (1997). This court has held that a trial court did not abuse its discretion by permitting a prosecutor to ask jurors whether an eyewitness identification "in and of itself" necessarily would be insufficient for them to return a verdict of guilty. State v. Roberts, 135 N.C. App. 690, 697, 522 S.E.2d 130, 134 (1999).
In the instant case, the prosecutor inquired as to whether a verdict of guilty could be returned in the absence of an eyewitness to the killing. This inquiry is similar to the one upheld in Roberts, and we discern no abuse of discretion by the trial court where it declined to intervene, without objection by defendant, to correct the alleged error.
Second, defendant urges that the prosecutor impermissibly asserted a personal opinion as to the credibility of defendant's probation officer, Benjamin Lynch, by making the following comment: "Ben Lynch is not going to come in here and tell you something that's not true. . . . Ben Lynch is not going to risk his reputation and his credibility on this case. . . ."
"`Counsel are afforded wide latitude in arguing hotly contested cases, and the scope of this latitude lies within the sound discretion of the trial court.'" State v. Holden, 346 N.C. 404, 429-30, 488 S.E.2d 514, 527-28 (1997) (quoting State v.Gregory, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995)). "Counsel may not, however, place before the jury incompetent and prejudicial matter by expressing personal knowledge, beliefs, and opinions not supported by evidence. Upon objection, the trial court has the duty to censor remarks not warranted by the evidence or law and may, in cases of gross impropriety, properly intervene ex mero motu." State v. Anderson, 322 N.C. 22, 37, 366 S.E.2d 459, 468 (1988) (citations omitted). "In cases where the defendant failed to object at trial, the impropriety of the argument must be gross indeed in order for [an appellate court] to hold that a trial judge abused his discretion in not recognizing and correcting ex mero motu an argument which defense counsel apparently did not believe was prejudicial when he heard it." Holden, 346 N.C. at 430, 488 S.E.2d at 528 (citation and internal quotation marks omitted).
In the instant case, the prosecutor merely argued that one of the State's witnesses was a credible witness whom the jury should believe. We find nothing improper about this argument. See State v. Zuniga, 320 N.C. 233, 256, 357 S.E.2d 898, 913 (1987).
Third, defendant contends that the prosecutor improperly stated that the defense's strategy of questioning police tactics and workmanship "may work in some famous case out in California" but that he had "a little more faith in a Rutherford County jury." Defendant did not object to this comment, and we conclude that, assuming arguendo that this statement was improper, it was not so grossly improper that the trial court abused its discretion bydeclining to intervene ex mero motu. These assignments of error are overruled.
In addition, we have carefully reviewed the remaining assignments of error that defendant has brought forward in his brief and have found them to be without merit. They are, therefore, overruled.
No Error.
Judges GEER and THORNBURG concur.
Report per Rule 30(e).